965 A.2d 1194

Joel S. ARIO, Insurance Commissioner of the Commonwealth of Pennsylvania, In His Official Capacity as Liquidator of Reliance Insurance Company, Appellant

v.

INGRAM MICRO, INC., Appellee.

Joel S. Ario, Insurance Commissioner of the Commonwealth of Pennsylvania, In His Official Capacity as Liquidator of Reliance Insurance Company, Appellant

v.

Mitsui & Co. (U.S.A.), Inc., Appellee.

Joel S. Ario, Insurance Commissioner of the Commonwealth of Pennsylvania, In His Official Capacity as Liquidator of Reliance Insurance Company, Appellant

v.

H.J. Heinz Company, H.J. Heinz Company, L.P., H.J. Heinz Finance Company, and Portion Pac, Inc., Appellees.

Joel S. Ario, Insurance Commissioner of the Commonwealth of Pennsylvania, In His Official Capacity as Liquidator of Reliance Insurance Company, Appellant

v.

Apple Computer, Inc., Appellee.

Supreme Court of Pennsylvania.

Argued March 3, 2008.

Decided Feb. 23, 2009.

Charlotte E. Thomas, Esq., Andrew A. Chirls, Esq., Stephanie Lynn Kosta, Esq., Amy Onder, Esq., Philadelphia, for Joel S. Ario, Acting Insurance Commissioner of the Commonwealth of the Pennsylvania (Nos. 19 MAP 2006, 20 MAP 2006, 21 MAP 2006, 22 MAP 2006).

Frederick P. Santarelli, Esq., Roger J. Harrington, Jr., Esq., Elliott Greenleaf & Siedzikowski, P.C., Blue Bell, for Ingram Micro Inc. (19 MAP 2006).

Rudolph Joseph DiMassa, Jr., Esq., Duane Morris, L.L.P., Philadelphia, for Mitsui & Co. (U.S.A.), Inc. (20 MAP 2006).

Rudolph Joseph DiMassa, Jr., Esq., Duane Morris, L.L.P., Philadelphia, for H.J. Heinz Company, et al., (21 MAP 2006).

Frederick P. Santarelli, Esq., Elliott Greenleaf & Siedzikowski, P.C., Philip S. Warden, Esq., Blue Bell, for Apple Computer Inc., (22 MAP 2006).

BEFORE: CASTILLE, C.J., and SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

## *OPINION*

Justice TODD.

In this direct appeal from a single-judge Commonwealth Court order, we consider whether an insurer's pre-liquidation payment for a covered loss to an insured constitutes a preference, and thus is recoverable by a liquidator of the insurer pursuant to 40 P.S. § 221.30(a). For the reasons stated below, we conclude a payment made by an insurer to an insured in the ordinary course of business does not constitute antecedent debt, and therefore, is not a preference under Section 221.30(a). Accordingly, we affirm the order of the Commonwealth Court, albeit upon different reasoning than employed by that tribunal.

By way of background, when an insurer becomes insolvent, it is subject to different statutory treatment under the laws of the various states. Our Commonwealth's law of insurance rehabilitation and insolvency is codified in Article V of the Pennsylvania Insurance Department Act of 1921 ("In-

surance Act").[1] One concern when an insurer becomes insolvent is the issue of preferences. Generally speaking, preferences are monies or property transferred to creditors on the eve of an insolvency petition, which places those creditors in a better position than they would be in if the money or property had not been transferred. *See* McCoid, Bankruptcy, Preferences, and Efficiency: An Expression of Doubt, 67 Va. L.Rev. 249, 249, 259–60 (1981). The liquidator of an insolvent insurer may institute a preference action to void certain transfers of property. Of course, a transfer, however, may be non-preferential if it does not fit within the statutory definition of a preference.

■ The Insurance Act sets forth what constitutes a preference in Section 221.30:

§ 221.30 Voidable preferences and liens

(a) A preference is a transfer of any of the property of an insurer to or for the benefit of a creditor, for or on account of an antecedent debt, made or suffered by the insurer within one year before the filing of a successful petition for liquidation under this article the effect of which transfer may be to enable the creditor to obtain a greater percentage of this debt than another creditor of the same class would receive. If a liquidation order is entered while the insurer is already subject to a rehabilitation order, then transfers otherwise qualifying shall be deemed preferences if made or suffered within one year before the filing of the successful petition for rehabilitation or within two years before the filing of the successful petition for liquidation, whichever time is shorter.

40 P.S. § 221.30(a). In other words, a preference consists of a transfer to a creditor for an antecedent debt made within a certain period of time prior to the filing of a liquidation or rehabilitation petition. Section 221.30 permits the liquidator to void such preferential transfers made within one year before the filing of a successful petition for liquidation, or, if the liquidation order is entered while the insurer is already

1. Act of Dec. 14, 1977, P.L. 280, No. 92, § 2; 40 P.S. §§ 221.1–221.63.

subject to a rehabilitation order, then transfers are deemed preferential if made within one year of the successful filing of the petition for rehabilitation.[2] With these background principles in mind, we turn to the facts of the case.

The facts underlying this appeal are straightforward. In 1999, Reliance Insurance Company ("Reliance") issued various insurance policies each known as a "Trade Credit Insurance Policy" (each a "Policy" and, collectively, the "Policies") to Apple Computer, Inc. ("Apple"); H.J. Heinz Company, H.J. Heinz Company L.P., H.J. Heinz Finance Company, and Portion Pac, Inc. (collectively, "H.J.Heinz"); Ingram Micro, Inc. ("Ingram Micro"); and Mitsui & Co. ("Mitsui") (Apple, H.J. Heinz, Ingram Micro, and Mitsui, are collectively referred to as the "Policyholders"). Pursuant to each Policy, Reliance insured the respective Policyholder and agreed to indemnify the Policyholder for losses arising from the Policyholder's customers' nonpayment for goods and services.

Subsequently, each Policyholder suffered a loss falling within the terms of the Policy and, pursuant to the terms and conditions of the Policies, each Policyholder made a claim, through the filing of a Claim and Proof of Loss, with Reliance in 2000.[3] Following Reliance's determination that the losses were covered by the Policies, and execution of a "Certifications and Release Agreement" as required by the Policies, Reliance paid the various Policyholders amounts due under

2. The rehabilitation and liquidation process was summarized by our Commonwealth Court in *Vickodil v. Commonwealth, Ins. Dept.,* 126 Pa.Cmwlth. 390, 396, 559 A.2d 1010, 1012–13 (1989):

> Rehabilitation of an insurer may be ordered on any number of grounds relating to the conduct of business by the insurer or its financial condition.... Once ordered, the Insurance Commissioner is appointed rehabilitator by the Court and has broad discretion to structure a plan of rehabilitation. The rehabilitator is required to take possession of the insurer's assets ... and has all the powers of its directors and officers to direct, manage and deal with the property and business of the insurer.... The powers and duties of a liquidator are generally the same. In short, the rehabilitator or liquidator step into the shoes of the insurer's officers and directors in the conduct of that insurer's affairs.

3. Specifically, Apple filed a Claim and Proof of Loss on April 14, 2000. H.J. Heinz filed its Claim and Proof of Loss on February 25, 2000; Ingram Micro filed claims at some unverified date on or about this same time; Mitsui filed its Claim and Proof of Loss on June 9, 2000.

the Policies in 2000 and early 2001.[4]

In May 2001, M. Diane Koken, then Insurance Commissioner for the Commonwealth, presented the Commonwealth Court with a petition to rehabilitate Reliance. By order dated May 29, 2001, and consistent with the Insurance Act, the Commonwealth Court appointed the Commissioner to serve as the rehabilitator of Reliance.[5] By the terms of that order, all assets of Reliance were placed under the control of the Commissioner and the Commonwealth Court. Thereafter, the Commissioner advised the Commonwealth Court that due to the large number of claims and the value of the estate, Reliance's condition was more precarious than initially presented, requiring immediate attention.

Approximately four months after Reliance's placement in receivership, on October 3, 2001, the Commissioner advised the Commonwealth Court that she consented to the entry of an order terminating the rehabilitation of Reliance and placing the insurer into liquidation.[6] The Commonwealth Court granted the petition and appointed the Commissioner as liquidator.[7]

4. Pursuant to the Policies, Reliance paid Apple $1,639,327.56 on August 7, 2000; H.J. Heinz $1,248,837.98 on August 28, 2000; Ingram Micro $240,827.24 on or about April 10, 2001, and $888,085.52 on or about May 8, 2001; and Mitsui $927,576.04 on August 28, 2000.

5. Section 221.15(c) of the Insurance Act states in relevant part:
 An order to rehabilitate the business of a domestic insurer, or an alien insurer domiciled in this Commonwealth, shall appoint the commissioner and his successors in office the rehabilitator, and shall direct the rehabilitator forthwith to take possession of the assets of the insurer including any deposits held by the commissioner, and to administer them under the orders of the court.
 40 P.S. § 221.15(c).

6. Section 221.18(a) provides in pertinent part:
 Whenever he has reasonable cause to believe that further attempts to rehabilitate an insurer would substantially increase the risk of loss to creditors, policy and certificate holders, or the public, or would be futile, the rehabilitator may petition the Commonwealth Court for an order of liquidation.
 40 P.S. § 221.18(a).

7. Section 221.20(c) concerns the appointment of the Commissioner as liquidator and provides in relevant part:

Thereafter, the Commissioner initiated actions against the Policyholders in Commonwealth Court seeking to avoid certain payments made prior to the entry of the liquidation order and to recover monies paid to the Policyholders pursuant to the Policies less than one year prior to the rehabilitation pursuant to Section 221.23 [8] and Section 221.26.[9] Initially, the Commissioner took the position the Policyholders were not policyholders or insureds, and the Policies were not insurance policies, but financial guaranties.[10] Each Policyholder filed an answer and new matter to the Commissioner's complaint.

The Commonwealth Court consolidated the actions for the purpose of resolving the issue of whether the payments made to the Policyholders constituted preferences under Section 221.30.[11] The Commissioner filed a motion for summary judgment in which she argued that the payments made under the Policies represented preferential transfers and sought to avoid them pursuant to Section 221.30. The Policyholders filed cross-motions for summary judgment, contending, *inter alia*, the monies paid by Reliance to them as policyholders were in the ordinary course of business and as such were not preferential payments.

In a single-judge memorandum opinion and order, President Judge James Gardner Colins granted the Policyholders' cross-

An order to liquidate the business of a domestic insurer shall appoint the commissioner and his successors in office liquidator and shall direct the liquidator forthwith to take possession of the assets of the insurer and to administer them under the orders of the court. 40 P.S. § 221.20(c).

8. 40 P.S. § 221.23 (concerning the power of the liquidator to collect debts).

9. 40 P.S. § 221.26 (governing the liquidator's institution of actions).

10. *See, e.g.*, Reply to H.J. Heinz New Matter ¶¶ 4–5, 7; Reply to Ingram Micro New Matter ¶¶ 5, 6, 7. The Commissioner subsequently altered her position on this matter, conceding the Policies were insurance polices and the Policyholders were insureds.

11. Upon its own motion, the Commonwealth Court assigned the matter to a referee for initial disposition. *See* 40 P.S. § 221.41(b). The parties were not, however, amenable to the appointment of a referee to oversee the preliminary aspects of the matter, and therefore, upon request, the Commonwealth Court withdrew the appointment and transferred the matter back to the court.

motions for summary judgment, concluding the transfers at issue were not preferences. Specifically, Judge Colins first agreed with the Commissioner that policyholders with claims for losses are "creditors" under Section 221.30 and that the payments at issue were for antecedent debt. Judge Colins held, however, that the debt arose at the first effective date of the insurance policy, not at the time of the filing of the Claim and Proof of Loss or at the time each Policyholder executed its Certifications and Release Agreement. Thus, according to Judge Colins, the payments were not preferences under the statute because the antecedent debts arose outside the one-year preference period. Notably, and relevant for purposes of our decision today, Judge Colins did not address or decide the issue of whether a transfer in the ordinary course of business constitutes an antecedent debt under the preference statute.

The Commissioner filed this direct appeal from the Commonwealth Court's order. We have jurisdiction over this matter pursuant to 42 Pa.C.S.A. § 723(a) (providing for "exclusive jurisdiction of appeals from final orders of the Commonwealth Court entered in any matter which was originally commenced in the Commonwealth Court except an order entered in a matter which constitutes an appeal to the Commonwealth Court from another court, a magisterial district judge or another government unit").

The issue before us, as stated by the Commissioner, concerns the question of "Whether the Commonwealth Court erred in holding that the date of issuance of an insurance policy, rather than the date of the payment by the insolvent insurer, is the transfer date that determines whether the payments were preferential pursuant to 40 P.S. § 221.30." Commissioner's Brief at 4. We note, however, that the parties have fully addressed numerous related issues in their briefs concerning the transfers that are the focus of this appeal, and we ultimately resolve this appeal on one of these issues.

As this matter comes to us in the context of the granting of summary judgment, we first set forth the applicable standards. With respect to the substantive standard

concerning summary judgment, the Pennsylvania Rules of Civil Procedure provide in relevant part, that the court shall enter judgment whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense that could be established by additional discovery. Pa.R.C.P. 1035.2(1). Under the rules, a motion for summary judgment is based on an evidentiary record that entitles the moving party to judgment as a matter of law. Pa.R.C.P. 1035.2. In considering the merits of a motion for summary judgment, a court views the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Fine v. Checcio*, 582 Pa. 253, 265, 870 A.2d 850, 857 (2005). Finally, a court may grant summary judgment only where the right to such judgment is clear and free from doubt. *Id.* (citing *Marks v. Tasman*, 527 Pa. 132, 589 A.2d 205 (1991)).

On review, an appellate court may reverse the granting of a motion for summary judgment if there has been an error of law or an abuse of discretion. *Atcovitz v. Gulph Mills Tennis Club, Inc.*, 571 Pa. 580, 585, 812 A.2d 1218, 1221 (2002). As the issue before us is whether transfers are preferences pursuant to Section 221.30 of the Insurance Law, it presents a pure question of law. Accordingly, our standard of review is *de novo*, and therefore, we owe no deference to the lower tribunal's determination. *Buffalo Twp. v. Jones*, 571 Pa. 637, 645 n. 4, 813 A.2d 659, 664 n. 4 (2002). Our scope of review, to the extent necessary to resolve the legal question before us, is plenary. *Id.*

Related thereto, we add that an appellate court may uphold an order of a lower court for any valid reason appearing from the record. *Wilson v. Plumstead Twp. ZHB*, 594 Pa. 416, 423 n. 3, 936 A.2d 1061, 1065 n. 3 (2007); *Hader v. Coplay Cement Mfg. Co.*, 410 Pa. 139, 145–46, 189 A.2d 271, 274 (1963) (quoting *Thomas v. Mann*, 28 Pa. 520, 4 Casey (28 Pa.) 520, 522 (1857)); *Sherwood v. Elgart*, 383 Pa. 110, 115, 117 A.2d 899, 901–02 (1955). This jurisprudential doctrine stems from

the focus of review as on the judgment or order before the appellate court, rather than any particular reasoning or rationale employed by the lower tribunal. *Hader,* 410 Pa. at 145, 189 A.2d at 274–75 ("The only error upon the record is a wrong reason for a right judgment; but as we review not reasons but judgments, we find nothing here to correct." (quoting *Thomas,* 4 Casey (28 Pa.) at 522)). With these standards in hand we consider the arguments of the parties.

The Commissioner offers various arguments as to why the decision of the Commonwealth Court should be reversed. First, the Commissioner maintains the payments at issue in this appeal satisfy all of the requirements of Section 221.30— the payments were made by Reliance less than one year before its rehabilitation, and they were made to creditors, the Policyholders, for an antecedent debt. Buttressing this contention, the Commissioner notes the Commonwealth Court found the Policyholders were creditors and the payments were for an antecedent debt, as Reliance paid claims for which the Policyholders submitted proofs of loss months earlier. Moreover, the payments were received by the Policyholders in the one-year period before the petition for rehabilitation was filed. Second, the Commissioner asserts the Commonwealth Court's ruling that the payments were not preferences because the "debt" was outside of the preference period is inconsistent with the statute and against the underlying policies of the Act, as Section 221.30 only requires that the transfer, i.e., the payment, be within the preference period, not that the debt should arise within the preference period. According to the Commissioner, it is the date of payment, not the age of the antecedent debt, that is the focus of the statute. Finally, the Commissioner contends that Section 221.30 does not provide for an ordinary course of business defense, and thus it should not be recognized as an exemption from the definition of preference.

The Policyholders, while urging affirmance of the Commonwealth Court's order, do not do so on the basis of the Commonwealth Court's rationale. Rather, emphasizing the ability of an appellate court to affirm a lower court's decision

on alternative grounds, the Policyholders argue that a payment made in the ordinary course of business is not a payment on account of an antecedent debt, and because Reliance's payments were made in the ordinary course of business, they are not preferences. Additionally, the Policyholders submit any debt of Reliance to the Policyholders did not arise until after the Policyholders executed a form of Certifications and Release which was an express condition in the Policies to receiving payment for the losses they suffered. As Reliance paid each of the Policyholders substantially contemporaneously with their satisfaction of this condition of payment, and Reliance's obligation did not arise until after this condition was satisfied, the Policyholders maintain that the debt was not antecedent at the time of the payment. Furthermore, the Policyholders assert that the Commissioner provided no "rational basis" for bringing preference actions against only four of the thousands of Reliance policyholders who received insurance payments during the preference look-back period. Finally, according to the Policyholders, Section 221.30 only applies to "creditors," and the term "creditor" does not encompass "policyholders." Therefore, the Policyholders conclude Section 221.30 does not apply to the payments made by Reliance to the Policyholders.

As our analysis involves interpreting Section 221.30 of the Insurance Act, we necessarily begin by considering the Statutory Construction Act. 1 Pa.C.S.A. §§ 1501 *et seq.* The Statutory Construction Act is clear the objective of all interpretation and construction of statutes is to ascertain and effectuate the intention of the legislature. 1 Pa.C.S.A. § 1921(a). Our Court has found that the best indication of the General Assembly's intent is the plain language of the statute. *Martin v. Commonwealth, Dep't of Transp., Bureau of Driver Licensing*, 588 Pa. 429, 438, 905 A.2d 438, 443 (2006). When the words of a statute are clear and unambiguous, there is no need to look beyond the plain meaning of the statute "under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b); *see Commonwealth v. Conklin*, 587 Pa. 140, 152, 897 A.2d 1168, 1175 (2006). Consequently, only when the words of a statute

are ambiguous should a court seek to ascertain the intent of the General Assembly through consideration of the various factors found in Section 1921(c). 1 Pa.C.S.A. § 1921(c); *Koken v. Reliance Ins. Co.*, 586 Pa. 269, 288, 893 A.2d 70, 81 (2006).

As the clearest indication of the legislature's intention is the words it has employed, we first direct our attention to the language of the preference statute. The relevant language in Section 221.30(a), concerning voidable preferences, provides: "A preference is a transfer of any of the property of an insurer to or for the benefit of a creditor, for or on account of an antecedent debt, made or suffered by the insurer within one year before the filing of a successful petition [for rehabilitation]." 40 P.S. § 221.30(a).

For purposes of this opinion, we initially turn to the requirement that the transfer be "for or on account of an antecedent debt," for if the transfers in question are not on account of an antecedent debt, they are not preferences under our insurance law, and thus not recoverable by the Commissioner. The phrase "antecedent debt" is not defined in the statute or in our case law. Each party offers a different interpretation of this language. In particular, the Commissioner submits that, as a general matter, an antecedent debt is considered to be a debt occurring when a creditor first had a claim against a debtor, whether fixed or contingent on subsequent events. According to the Commissioner, the payments here were made after the Policies' inception and were made months after the Policyholders made claims for payment, and thus they constitute antecedent debt. Moreover, the Commissioner argues, the preference action cannot be defeated by the contention that Reliance's payments of proceeds to the Policyholders were made in the ordinary course of business because the Insurance Act provides for no such exemption. Indeed, Section 221.30(a) does not use or refer to the terms "ordinary course of business." The Commissioner notes while there is an ordinary course of business exemption in the federal bankruptcy law and in certain state insurance laws, these are set forth as express defenses to a preference action in the statute.

According to the Commissioner, if the General Assembly had intended the defense be available, it could have provided for such an exemption.

The Policyholders do not dispute the general meaning of the phrase antecedent debt, but counter that payments on account of an antecedent debt do not include transfers made in the ordinary course of business as that phrase is used in Section 221.30. Among other arguments, the Policyholders emphasize that the phrase is not defined, and an interpretation recognizing an ordinary course of business exception is consistent with both long-standing judicial decisions under federal bankruptcy law and a recent decision by an Ohio appellate court interpreting an Ohio preference provision identical to Section 221.30.

Based upon the failure of the General Assembly to define the phrase "antecedent debt," the parties' differing assertions concerning the meaning of these words, and our conclusion that both parties have provided reasonable interpretations of the statute, we conclude that this phrase "antecedent debt" is not free from all ambiguity. Accordingly, we turn to factors set forth in 1 Pa.C.S.A. § 1921(c) to ascertain the intent of the legislature.[12]

In evaluating all of these statutory factors, we conclude those most applicable to this appeal are the occasion and necessity for the statute, the object to be obtained by the statute, former law, including other statutes upon the same subject, and the consequences of a particular interpretation. 1 Pa.C.S.A. § 1921(c)(1), (4), (5), and (6).

**12.** The factors which may be considered in discerning the General Assembly's intent include:

(1) The occasion and necessity for the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be obtained.

(5) The former law, if any, including other statutes upon the same or similar subjects.

(6) The consequences of a particular interpretation.

(7) The contemporaneous legislative history.

(8) Legislative and administrative interpretations of such statute.

1 Pa.C.S.A. § 1921(c).

The purpose of Article V of the Insurance Act, and the object to be obtained by the statute, are set forth in the statute itself. Specifically, it is plain that the primary purpose of Article V is to protect the interests of insureds, creditors, and the public. 40 P.S. § 221.1(c). Section 221.1(c) states in full:

**The purpose of this article is the protection of the interests of insureds, creditors, and the public generally, with minimum interference with the normal prerogatives of the owners and managers of insurers,** through (i) early detection of any potentially dangerous condition in an insurer, and prompt application of appropriate corrective measures; (ii) improved methods for rehabilitating insurers, involving the cooperation and management expertise of the insurance industry; (iii) enhanced efficiency and economy of liquidation, through clarification and specification of the law, to minimize legal uncertainty and litigation; (iv) equitable apportionment of any unavoidable loss; (v) lessening the problems of interstate rehabilitation and liquidation by facilitating cooperation between states in the liquidation process, and by extending the scope of personal jurisdiction over debtors of the insurer outside this Commonwealth; and (vi) regulation of the insurance business by the impact of the law relating to delinquency procedures and substantive rules on the entire insurance business.

40 P.S. § 221.1(c) (emphasis added); *see also Foster v. Mutual Fire, Marine and Inland Ins. Co.*, 544 Pa. 387, 676 A.2d 652, 661 (1996) ("one of the purposes of the Act is the protection of the interests of insureds, creditors, and the public generally"); *Koken,* 586 Pa. at 291, 893 A.2d at 83 (quoting *Koken v. Steinberg,* 825 A.2d 723, 726 (Pa.Cmwlth.2003) ("It is now settled law in Pennsylvania that an insurance regulator is charged not only with representing the public interest but the interests of policyholders and creditors as well")). Moreover, Article V is to be "liberally construed" to effect this purpose. 40 P.S. § 221.1(b).

Additionally, preference provisions in particular are designed to achieve equitable apportionment of unavoidable

losses. 40 P.S. § 221.1(c). Consistent therewith, it is beyond debate that such provisions are intended to "discourage creditors from racing to the courthouse to dismember the debtor during his slide into bankruptcy." *See Wilcox v. CSX Corp.,* 70 P.3d 85, 91 (Utah 2003) (citation omitted); *see also Miniscribe Corp. v. Keymarc, Inc.,* 123 B.R. 86, 90 (Bankr.D.Colo. 1991) ("[t]he purpose of the preference statute is to discourage creditors from engaging in *unusual collection practices* which help dismember the debtor" (emphasis added)).

The General Assembly has also instructed us to consider other law addressing this same topic in understanding its intentions. 1 Pa.C.S.A. § 1921(c)(5). We first consider federal bankruptcy law and then turn to treatment of the subject by other states.

 Use of federal bankruptcy law for guidance in interpreting ambiguous state insurance insolvency law is commonly accepted. *Wilcox,* 70 P.3d at 92; *Pine Top Ins. Co. v. Bank of America Nat'l Trust and Sav. Assoc.,* 969 F.2d 321, 324 (7th Cir.1992) ("When confronted with a voidable preference dispute under state insurance law, it is customary to look to federal bankruptcy law for guidance"). Article V was enacted in 1977; thus, the Bankruptcy Act of 1898, rather than the Bankruptcy Code of 1978, is most germane to the interpretation of Section 221.30. The preference provision in the earlier Bankruptcy Act did not expressly include an exception for payments made in the ordinary course of business. The courts interpreting the federal law, however, developed what came to be known as the "current expense" rule to cover certain situations in which a debtor's payments on the eve of bankruptcy did not diminish the estate because tangible assets were obtained in exchange for the payment. *Marshall v. Florida National Bank of Jacksonville,* 112 F.2d 380, 381–82 (5th Cir.1940). Under this doctrine, courts often allowed an exception for regular business expenses based on the notion that current expenses were not antecedent debt, and were, therefore, not preferential. *In re Peninsula Roofing & Sheet Metal, Inc.,* 9 B.R. 257, 261–62 (1981). Courts believed that such an exception did not detract from the general policy of a

preference provision to discourage unusual action by the debtor or his creditors during the debtor's slide into bankruptcy. *Matter of Emerald Oil Co.,* 695 F.2d 833, 836 (5th Cir.1983).

Thereafter, in 1978, the federal bankruptcy law was reformed. Specifically, Section 547(c)(2) provides a trustee may not avoid a transfer if the transfer was "in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee; and such transfer was (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms." 11 U.S.C. § 547(c)(2). While Section 547(c)(2) is not an express codification of the current expense rule or its statutory equivalent, and the parties do not contend that the transfers at issue in this appeal would qualify as a current expense, which requires the transfer of property to the insolvent entity, the policy underlying Section 547(c)(2) and the judicially-recognized current expense rule under the Bankruptcy Act of 1898 is the same. *Barash v. Public Finance Corp.,* 658 F.2d 504, 510–11 (7th Cir.1981); *In re Acme–Dunham, Inc.,* 50 B.R. 734, 740 (D.C.Me.1985).

Therefore, considering analogous federal bankruptcy law, we see the federal judiciary has seen fit to recognize an exception to the then-existing statutory preference provision in the form of the current expense rule, and the policy behind that rule was later embraced in the ordinary course of business exemption.

Turning to state law treatment of this subject, one state has recognized an ordinary course of business transfer exception in its statutory law. *See* Utah Code § 31A–27–321 (2001) (providing an affirmative defense of a payment being made in the ordinary course of business). Yet, recently two state courts analyzed the issue of whether such an exception exists when the statute does not explicitly provide for such an exemption, as is the case in Pennsylvania. While certainly not binding, we look to these decisions to guide us in our resolution of the issue before us.

Specifically, as both parties discuss, the Court of Appeals of Ohio in *Covington v. HKM Direct Market Communications, Inc.*, 2003 Ohio 6306, 2003 Ohio App. Lexis 5645, 2003 WL 22784378 (Ohio App. Nov. 25, 2003) (unpublished opinion), considered whether payments made by an insolvent insurer to a company for printing and direct mail services, postage, and sales tax were made for or on account of an antecedent debt and were therefore preferential under the Ohio liquidation statute. The Court of Appeals first acknowledged the term "antecedent debt" was not defined in the statute. The court looked to federal bankruptcy law, recognizing the current expense rule as well as the ordinary course of business exception noted above, and reasoned strong policy considerations existed to rehabilitate ailing insurers, including the concept that effective rehabilitation permitted an insurer to remain in business and serve the interests of policyholders, creditors, and the general public. The court opined that if "payments in the regular course of business were voidable, ordinary vendors and trade creditors would be loathe [sic] to do business with insurers." *Id.* at ¶ 10. Thus, the Court of Appeals of Ohio concluded the term "antecedent debt" did not include transactions conducted in the ordinary course of business.

The Supreme Court of Nebraska, however, came to a contrary conclusion in the context of payments by an insurer declared insolvent to an obligee based on a performance bond under Nebraska's preference law. *Wagner v. Gilbane Building Co.*, 276 Neb. 686, 757 N.W.2d 194 (2008). Specifically, the court addressed, *inter alia*, the claim made by the obligee that the insurer's payments were in the ordinary course of business as a surety and, thus, did not constitute a voidable preference. The court concluded that because the statute concerning preferences did not contain an express ordinary course of business exception, the Nebraska legislature did not intend to permit such an exception. *Id.* at 695; 757 N.W.2d at 201–02.

Thus, it appears the only two judicial decisions addressing similar issues of state law have come to divergent but equally

reasonable conclusions with respect to whether their respective legislature intended transfers, made in the ordinary course of business, to be embraced by the undefined phrase "antecedent debt."

Finally, we consider the consequences of a particular interpretation. While the Commissioner suggests this appeal is limited to its facts and the specific policies before us and, thus, has no wide-ranging implications, the Policyholders warn if an insurer's routine payment of monies to an insured pursuant to a claim under its policy could be avoided as a preference, this could disrupt our Commonwealth's insurance market. Specifically, consumers of insurance might migrate to choosing policies from insurance carriers domiciled in states where they would not be exposed to the risk of having proceeds taken away from them as preferential transfers, encouraging domicile shopping adverse to Pennsylvania insurers and placing Commonwealth insurers at a competitive disadvantage. Moreover, the Policyholders raise the specter of a Pennsylvania insured deciding to move its coverage when the insurer begins to experience financial difficulties if payments of claims are subjected to preference actions. This in turn would exacerbate a troubled insurer's difficulties and would be antithetical to the purpose of protecting the interests of the insureds, creditors, and the general public.

After considering various factors in order to discern the legislature's intent, and in harmonizing the sometimes competing purposes underlying Article V of the Insurance Act, we conclude that the General Assembly intended the term "antecedent debt" to not include transfers made in the ordinary course of business.

First, we find this construction of Section 221.30 best upholds the interests of insureds, including policyholders of insurance, creditors, and the public, as well as the interests of insurers. Specifically, our interpretation of the phrase antecedent debt protects and upholds the economic expectations of insureds, including policyholders. At the same time, it prohibits unusual transfers and the proverbial race to the courthouse

steps. Thus, our interpretation embraces concepts of both insured protection and equitable apportionment of losses. Additionally, we find our conclusion regarding legislative intent is consistent with the principles underlying federal bankruptcy law and with the federal courts' experience under such law. Indeed, in the past, federal courts have not hesitated to judicially recognize limited exceptions to transfers that were otherwise preferences. While one state has expressly adopted an ordinary course of business transfer exception, other states that have considered similar issues have come to differing, albeit reasonable, conclusions. We simply find more compelling the approach which recognizes the phrase "antecedent debt" not to include ordinary course of business transfers.

Significantly, we believe that, as a practical matter, a contrary interpretation of Section 221.30 would be harmful to both the insurance industry in our Commonwealth as well as insureds. An insurance consumer's selection of an insurer might very well turn on whether a policyholder's receipt of monies paid for a loss by an insurer may be recovered as a voidable preference, and thus lead to domicile shopping in which potential policyholders avoid purchasing insurance from Pennsylvania insurers. Moreover, we find that without an ordinary course of business transfer exception, a real possibility exists that a distressed insurance company would not be able to be restored to financial stability due to policyholders cancelling existing coverage with that troubled insurer and seeking replacement coverage with another insurer. Finally, we simply do not believe that the General Assembly intended to create the uncertainty that would arise for insureds that have been paid in full for losses covered by varying insurance policies, such as automobile, workers' compensation, and life insurance, if such payments could be regarded as preferences and taken back by the Commissioner. Thus, we conclude that the practical consequences of not recognizing an ordinary course of business exception provide a strong indication of the legislature's intention.[13] While arguments certainly can be

13. Finally, we note that when initially bringing these preference actions, the Commissioner did not consider the Policies to be insurance

made to the contrary, if the General Assembly did not intend the conclusion we reach today, it may amend the Insurance Act accordingly.

■ We now apply our holding to the transfers at issue, and we find based on the record before us, that these transfers were made in the ordinary course of business. Specifically, Reliance's obligation to pay arose from a typical arms-length commercial transaction. The Policyholders submitted claims to Reliance to recover their losses. Reliance made the payments after each Policyholder filed a Claim and Proof of Loss under its Policy, after Reliance determined that the claim was covered, and after the Policyholder executed a Certifications and Release Agreement, all in accord with the terms of the Policy. The claims were processed and paid in consistent and uniform fashion. *Accord Wilcox,* 70 P.3d at 98 (stating as a general proposition that reviewing, settling, and paying disputed claims is at the heart of the insurance industry, and that such payments are in the ordinary course of an insurer's business).

The Commissioner attempts to distinguish these transactions from other transfers paid on claims by insureds by asserting that, herein, monies were paid beyond the period to pay claims under the terms of the Policies. According to the Commissioner, the payments were made outside the two-month period for deciding coverage under the Policies. From this, the Commissioner contends, without citation to legal authority, even if the term antecedent debt does not include transfers made in the ordinary course of business, these payments nevertheless constitute antecedent debt.

■ Late payments may, by their very lateness, be made out of the ordinary course of business, and hence, such lateness could indicate a preference. *See generally In re Classic Drywall,* 121 B.R. 69, 77 (D.Kan.1990) ("While a payment late under the written terms of the parties' agreement is a strong

policies or the Policyholders to be insureds, and was apparently reluctant to come to its current position.

indicator of a preference, this fact alone does not preclude an ordinary business exception.").[14]

▮▮▮ In the present matter, however, the record does not disclose that these payments were late. First, contrary to the Commissioner's assertions, there was no two-month period by which the payments had to be made. Rather, within two months of the initial claim, the insurer was required to decide whether and to what extent the claim was valid. After that, a "waiting period" of up to six months was triggered before payment was due, *see, e.g.,* Ingram Micro Policy (RR.127a), and in any event, payment was not mandatory until the insured signed a Certifications and Release Agreement form, which would not occur until after the insurer's decision that the claim was valid. Therefore, while a long delay could, in an appropriate case, give rise to a colorable argument that the payments were preferences, the Commissioner's allegations in the present matter were insufficient to create a genuine issue of fact for summary judgment purposes.[15]

14. The *Classic Drywall* court explained further that

> late payments, in and of themselves, indicate a trade relationship that is most often out of the ordinary.... However, if the creditor-transferee can satisfy its burden that such a practice was consistent with the parties' prior course of dealings and, to a lesser extent, was consistent with common industry practice, then the ordinary course of business exception will apply and recovery of the preferential transfer will be denied.

*Id.* (quoting *In re Websco, Inc.,* 92 B.R. 1, 3 (1988)).

15. In this respect, it is worth noting that a non-moving plaintiff bears some evidentiary burden to survive a defense summary judgment motion, as this Court has explained:

> [a] non-moving party must adduce sufficient evidence on an issue essential to his case and on which he bears the burden of proof such that a jury could return a verdict in his favor. Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Ertel v. Patriot–News,* 544 Pa. 93, 101–02, 674 A.2d 1038, 1042 (1996). *See generally Bill Johnson's Restaurants v. NLRB,* 461 U.S. 731, 745 n. 11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (offering that when evaluating pre-trial evidence for purposes of the "genuine issue" standard on a motion for summary judgment, courts should use the same standard as is applicable to trial evidence on a motion for a directed verdict); *Ertel,* 544 Pa. at 101, 674 A.2d at 1042 (adopting the federal standard for

As we find that payments made in the ordinary course of business are not on account of an "antecedent debt" as that term is used in Section 221.30, and that the payments made by Reliance to the Policyholders at issue in this appeal were made in the ordinary course of business, we conclude that the transfers by Reliance to the Policyholders are not preferences, and thus not recoverable by the Commissioner.[16]

The order of the Commonwealth Court is hereby affirmed, albeit for reasons that differ from those utilized by that court. Jurisdiction relinquished.

Chief Justice CASTILLE and Justice SAYLOR, EAKIN, BAER and McCAFFERY join the opinion.

evaluating whether plaintiff's evidence is sufficient to survive a defense motion for summary judgment).

16. Based upon this conclusion, we need not reach the other arguments made by the Commissioner in this appeal.