J-S71030-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

K.L.O.,

        Appellee

        v.

S.K.,

        Appellant

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 1055 WDA 2015

Appeal from the Order entered June 8, 2015,
in the Court of Common Pleas of Blair County,
Civil Division, at No(s): 2013 GN 3679

BEFORE:  FORD ELLIOTT, P.J.E., SHOGAN, and OTT, JJ.

MEMORANDUM BY SHOGAN, J.:          **FILED JANUARY 08, 2016**

S.K., a/k/a S.O.K. ("Mother") appeals from the order entered on June 8, 2015, that awarded the parties shared legal custody of their son, N.K.-O. ("Child").  The order also awarded primary custody of Child to K.L.O. ("Father") and partial physical custody to Mother.  We affirm.

The trial court set forth the procedural history of this appeal as follows:

> The parties . . . are the parents of one (1) minor child, [Child, born in November of 2013.]  The parents met in January 2013 through the "Christian Mingle" on-line dating service and were married [in June of 2013.]  The parties lived together for approximately one (1) month until [Father] filed for divorce [in July of 2013].  [Father] is self-employed in the asphalt sealing business.  His primary season is June through October each year, and he is generally off November through May. [Mother] is currently not working due to recent knee surgery.  She attends physical therapy three (3) times per week.  It is her hope to return to her former employment cleaning houses.

[Father] is currently forty-one (41) years of age and resides in his own home . . . [in] Roaring Spring, PA. He has resided there for five (5) years and describes his home as a ranch[-]style home, sitting on 3½ acres, mostly wooded. The home has three (3) bedrooms and two (2) baths upstairs. There is a full bath downstairs. [Child] has his own bedroom and playroom.

[Mother] is 31 years of age and lives [in] Sproul, PA, where she has resided since on about October 1, 2014. She lives with her fiancé, [T.H.], her two (2) daughters from a prior relationship, [A.] (7 years of age), and [J.] (5 years of age), as well as [Child]. [T.H.] moved in with this family unit at the end of June, 2014.

There is a Custody Order in effect, dated February 4, 2014, along with an Addendum dated June 17, 2014. Pursuant to the controlling orders of court, the parents share legal and physical custody, while [Mother] has primary residential custody of [Child]. [Father] has partial custody the first three (3) weekends each month from Friday, 9:00 a.m. until Saturday at 3:00 p.m., and Friday [at] 9:00 a.m. until 3:00 p.m. the fourth weekend. The holidays are shared by mutual agreement. The parties share in transportation and normally exchange custody at the Sheetz [s]tore in McKee, PA.

[On June 16, 2014, Father] filed a request for a custody evidentiary hearing[1] as he is seeking primary, physical custody of the subject child. The first evidentiary hearing was held December 11, 2014, during which a former neighbor [of Mother, L.B.], testified on behalf of [Father]. [Father] also testified on his own behalf. [Mother] testified, however, due to time constraints, she was unable to complete her testimony. Therefore, a second evidentiary hearing was held June 1, 2015, during which [Mother] completed her testimony and her fiancé, [T.H.], testified as well.

Trial Court Opinion and Order, 6/8/15, at 1–2 (internal citations omitted)

(footnote added). The trial court entered its Opinion and Order on June 8,

_____

[1]  Mother filed a complaint for custody on December 3, 2013, and Father filed a counter-complaint on December 6, 2013.

2015, discussing its findings related to the sixteen custody factors set forth in section 5328(a) of the Child Custody Act, ("the Act"), 23 Pa.C.S. §§ 5321–5340.

On July 8, 2015, Mother filed a timely notice of appeal and concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In her brief on appeal, Mother raises the following issues:

A. Whether the lower court erred and abused its discretion by awarding primary physical custody to [Father], as there was insufficient evidence to show that [Father] had met his burden to show that modification was in the child's best interests?

B. Whether the lower court erred and abused its discretion by fashioning a custody order that separated the subject child from his siblings, as the evidence did not show a compelling reason to separate the children?

C. Whether the lower court's custody determination went against the weight of the evidence, as the majority of the evidence on the custody factors under 23 Pa.C.S.A. § 5328 militated in favor of a finding that primary physical custody should be awarded to [Mother]?

D. Whether the lower court erred and abused its discretion by basing its decision on the past conduct of [Mother], as it was no longer applicable because there was no evidence it produced an ongoing negative effect on the child's welfare?

E. Whether the lower court erred and abused its discretion by failing to appropriately consider [Mother's] role as the primary caretaker of the subject child in fashioning the new custody order?

Mother's Brief at 3.  Mother combined her argument of issues A and C.

Mother argues that the evidence presented supported a finding that she should have been awarded primary physical custody of Child. She asserts that Father did not produce sufficient evidence to support an award of primary physical custody. Mother also contends that the trial court erred by separating Child from her daughters, A. and J., who are his half-sisters, as the evidence showed that Child has a loving, affectionate, and beneficial relationship with them. Mother also argues that the trial court erred in basing its decision on her past conduct because it had no ongoing negative effect on him. Finally, Mother contends that in fashioning the custody order, the trial court erred and abused its discretion by failing to consider her role as Child's primary caretaker. Mother's Brief at 5.

Initially, we observe that because the custody hearings in this matter were held in December of 2014 and June of 2015, the Act is applicable. ***C.R.F. v. S.E.F.***, 45 A.3d 441, 445 (Pa. Super. 2012) (holding when custody evidentiary proceeding commences on or after the effective date of the Act, January 24, 2011, the provisions of the Act apply).

In custody cases, our standard of review is as follows:

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable

as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

***R.L.P. v. R.F.M.***, 110 A.3d 201, 207–208 (Pa.Super. 2015) (quoting ***C.R.F.***, 45 A.3d at 443).

We have stated:

The discretion that a trial court employs in custody matters should be accorded the utmost respect, given the special nature of the proceeding and the lasting impact the result will have on the lives of the parties concerned. Indeed, the knowledge gained by a trial court in observing witnesses in a custody proceeding cannot adequately be imparted to an appellate court by a printed record.

***Ketterer v. Seifert***, 902 A.2d 533, 540 (Pa. Super. 2006) (*quoting* ***Jackson v. Beck***, 858 A.2d 1250, 1254 (Pa. Super. 2004)).

In ***M.A.T. v. G.S.T.***, 989 A.2d 11 (Pa. Super. 2010) (*en banc*), we stated the following regarding an abuse of discretion standard.

Although we are given a broad power of review, we are constrained by an abuse of discretion standard when evaluating the court's order. An abuse of discretion is not merely an error of judgment, but if the court's judgment is manifestly unreasonable as shown by the evidence of record, discretion is abused. An abuse of discretion is also made out where it appears from a review of the record that there is no evidence to support the court's findings or that there is a capricious disbelief of evidence.

***Id.*** at 18–19 (quotation and citations omitted).

With any custody case decided under the Act, the paramount concern is the best interests of the child. ***See*** 23 Pa.C.S. §§ 5328, 5338. Section 5338 of the Act provides that upon petition, a trial court may modify

a custody order if it serves the best interests of the child. 23 Pa.C.S. § 5338. The best interest factors that the trial court must consider are set forth at 23 Pa.C.S. § 5328. *E.D. v. M.P.*, 33 A.3d 73, 80–81 n.2 (Pa. Super. 2011).

Section 5328(a) of the Act provides as follows:

**§ 5328. Factors to consider when awarding custody**

**(a) Factors.**—In ordering any form of custody, the court shall determine the best interest of the child by considering all relevant factors, giving weighted consideration to those factors which affect the safety of the child, including the following:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a)(1) and (2) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.  A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S. § 5328.[2]

In *A.V. v. S.T.*, 87 A.3d 818 (Pa. Super. 2014), this Court explained:

---

[2]  Effective January 1, 2014, the statute was amended to include an additional factor at 23 Pa.C.S. § 5328(a)(2.1) (providing for consideration of child abuse and involvement with child protective services).  Although applicable at the time of the custody hearings in this matter, there was no evidence that would have required the trial court's consideration of this factor.

"***All*** of the factors listed in section 5328(a) are required to be considered by the trial court when entering a custody order." ***J.R.M. v. J.E.A.***, 33 A.3d 647, 652 (Pa. Super. 2011) (emphasis in original). . . . The record must be clear on appeal that the trial court considered all the factors. ***Id.***

Section 5323(d) provides that a trial court "shall delineate the reasons for its decision on the record or in open court or in a written opinion or order." 23 Pa.C.S.A. 5323(d). Additionally, "section 5323(d) requires the trial court to set forth its mandatory assessment of the sixteen [Section 5328 custody] factors prior to the deadline by which a litigant must file a notice of appeal." ***C.B. v. J.B.***, 65 A.3d 946, 955 (Pa. Super. 2013), *appeal denied*, 70 A.3d 808 (Pa. 2013). Section 5323(d) applies to cases involving custody and relocation. ***A.M.S. v. M.R.C.***, 70 A.3d 830, 835 (Pa. Super. 2013).

In expressing the reasons for its decision, "there is no required amount of detail for the trial court's explanation; all that is required is that the enumerated factors are considered and that the custody decision is based on those considerations." ***M.J.M. v. M.L.G.***, 63 A.3d 331, 336 (Pa. Super. 2013), *appeal denied*, 68 A.3d 909 (Pa. 2013). A court's explanation of reasons for its decision, which adequately addresses the relevant factors, complies with Section 5323(d). ***Id.***

***A.V.***, 87 A.3d at 822–823.

In the present appeal, the trial court discussed the sixteen custody best-interest factors as follows:

**(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party?**

The testimony established that [Mother] has been very open and willing to provide [Father] additional time over and above the partial custody schedule set forth in the Custody Order. For example, when [Mother] was working on Mondays, she agreed that [Father] could have the child from 8:45 a.m. until 4:30 or 5:00 p.m. Both parents testified that, generally, their communication is civil in nature and that they have been able to work out the holidays by mutual agreement as well as

make adjustments in the custody schedule. [Father] testified that he has been flexible with [Mother] relative to his schedule and gave some specific examples. We are satisfied that both parties have demonstrated a willingness to be flexible and both would encourage or promote continuing contact with the other party.

**(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.**

There is no evidence of any present or past abuse committed by [Father] to [Child] or any party. [Father] lives alone except when [Child] is in his custody. [Father] presented the testimony of [L.B.], who used to live next door to [Mother] and her family. She testified that she had observed [Mother] screaming, yelling and cursing at the children and observed her beating them with a wooden spoon. [L.B.] also testified that she has seen [T.H.], [Mother's] fiancé, tap the girls' genital areas when he corrects them. There was no evidence presented of any physical abuse between [Mother] and [T.H.] [T.H.] did acknowledge that he was scheduled for a hearing on Friday, June 5, 2015[,] in the State of Minnesota relative to allegations that he threatened his wife and left a bruise on her leg. [T.H.] denied the allegations and indicated that the alleged incident occurred more than one (1) year ago.

**(3) The parental duties performed by each party on behalf of the child.**

We find that both parents have performed parental duties concerning [Child] and that each parent is fully capable of performing such parental duties. It is also significant that both parents have attended the vast majority of [Child's] medical appointments.

[Father] was present when the child was born at Nason Hospital, Roaring Spring, PA. [Child] did have medical issues upon birth and [Child] was transported by ambulance to the Conemaugh Hospital Neonatal intensive Care (NIC) Unit in Johnstown, PA. Each of the parents [was] with [Child] during the five (5) days that he was in the NIC Unit.

**(4) The need for stability and continuity in the child's education, family life and community life.**

[Child] is only 1½ years of age and, therefore, is not currently attending school. Both parents have been significantly involved in [Child's] life since the date of his birth. [Mother] has served as primary custodian, however, [Father] has had significant partial custody rights. There is no doubt that both parents love [Child] and have formed a bond with him. We also accept that [Child] has formed a bond with his two half-sisters, [A. and J.] [Child] also has the benefit of having his parental grandparents and extended members of [Father's] family in the area to serve as an additional support system into his future.

We accept [Mother's] testimony that the last 1½ years "has been the most stable time" in her life. [T.H.] seems to have helped stabilize her life. [Mother] and [T.H.] have lived together for a little over one (1) year and are interested in purchasing a larger home. They are looking at a home in Queen, PA, which is just over the Blair County Line in Bedford County, however, still within the Claysburg-Kimmel School District. The parents do live in different school districts, although [Child] has not yet started school.

[T.H.] has a Chemistry Degree and is employed as a Station Chemist for the Homer City Generating Station, where he directs all activities for the environmental discharge of services along the Eastern seaboard. He has been employed in his current position for approximately three (3) years. His job brought him from Minnesota to Pennsylvania, originally residing in Indiana, PA, before relocating to Sproul, PA to be with [Mother]. [T.H.] has filed for divorce in Blair County, PA[,] against his current wife, to whom he has been married for fourteen years. [T.H.] has five adult children, three of whom he adopted during his first marriage, and the youngest two from a different marriage. There was no testimony as to whether he has maintained contact and communication with any of his children.

[T.H.] recognizes that he is not the biological father of [Child], and respects the role that [Father] has played and will continue to play in [Child's] life. [T.H.] engages in activities with the children and helps the girls with their school work on a nightly basis.

- 10 -

**(5) The availability of extended family.**

[Father's] parents live in Martinsburg, PA, approximately 9 miles from his home. [Father] has extended family in the area, as he grew up in the Roaring Spring, Martinsburg area and is a graduate of Central High School. The paternal grandmother was employed as a Manager of the Housekeeping Department at the Village of Morrison's Cove Retirement home. It was her intention to retire this past December and she would be available, along with other extended family members, to care for [Child] if and when [Father] was unavailable.

[Mother] is from the Carlisle area, where certain family members still reside. Her fiancé, [T.H.], moved to Pennsylvania from Minnesota and has no family in Pennsylvania.

**(6) The child's sibling relationships.**

[Father] has no other children, while [Mother] has two (2) daughters, [A.] (7 years of age) and [J.] (5 years of age) of her prior relationship with [M.D.]. [Mother] was formerly married to [M.D.], and she freely acknowledged that he was very abusive and controlling during their relationship. [A. and J.] are the half-siblings of . . . [Child]. [Mother] described her two (2) daughters as "mother hens" and [stated] that they look out for [Child]. She further testified that there is a special bond between [J.] and [Child].

**(7) The well- reasoned preference of the child, based on the child's maturity and, judgment.**

Not applicable as the subject child is only 1½ years of age.

**(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.**

There is no evidence that either party engages in any actions in an attempt to turn the child against the other parent, therefore, this is a non-factor.

- 11 -

**(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs?**

Both of these parents love [Child]. We do find, however, that [Father] is the party more likely to maintain a loving, stable, consistent and nurturing relationship with [Child] adequate for the child's emotional needs.

[Mother], unfortunately, has a significant past history. She has been married two (2) times. Her first marriage was to [M.D.], who has fathered five (5) children with [Mother]. Her parental rights to her first three (3) children — [M.] (now 13 years of age), [C.] (11) and [L.] (8) — were involuntar[ily] terminated through a dependency proceeding in Dauphin County, PA. [Mother] met [M.D.] in 2001 when she was 17 years of age and he was 21. [Mother's] mother objected to their relationship[,] and [Mother] moved out of her mother's home into the home of [M.D.'s] parents. Unfortunately, things did not work out there[,] and the couple went out on their own. [Mother] testified that after she became pregnant with [M.], [M.D.] became "nasty and controlling". [C.] was born in 2003[,] and the parties married in April 2005. At that time, [Mother] testified that [M.D.] became "very physically abusive", that there were "a lot of police calls" and that she was "transported by ambulance numerous times" but would eventually agree to drop the criminal charges filed against [M.D.]

[Mother] told of a "major incident" in 2007 when the police were called and [M.D.] was arrested and put in the Dauphin County Prison. She indicated that she refused to testify against him and, therefore, was charged with Perjury, Unsworn Falsification, Endangering Welfare of Children[,] and five (5) counts of Cruelty to Animals. She confirmed that [M.D.] was abusive toward the children. She eventually pled guilty to the Endangering Welfare and Animal Cruelty charges and received probation.

During the course of the investigation, the local Children, Youth & Services took custody of the children and directed that [Mother] attend parenting classes, obtain stable housing and employment, attend visits with the children at the foster parents['] and put other reunification services into effect. [Mother] unfortunately, chose to resume her relationship with

- 12 -

[M.D.], eventually resulting in reunification services ending and termination of parental rights decrees being entered against both parents.

[Mother] acknowledged that relative to the underlying CYS investigation wherein the Agency took custody and ultimately terminated the parents' parental rights, . . . the allegations also included deplorable home conditions, including the smell of animal feces and urine. At that time, there were two (2) dogs and two (2) cats residing within the residence.

[M.D.] is also the biological father of [A. and J.]. [Mother] has full legal and physical custody of these two girls through a Dauphin County Order.

We specifically note [Mother's] testimony concerning any continued contact between [A.], [J.,] and [M.D.] was inconsistent between our hearings. At our first hearing, [Mother] testified that [M.D.] does not have contact with the girls and that they have "no relationship" with him. She testified that [M.D.] has attempted to contact her, but that she ignores him. She did state that [M.D.] will text her on occasion and inquire about the girls, and she will respond since he is their father.

During our second hearing, [Mother] acknowledged that she has run into [M.D.] on a few occasions (she estimates 3 to 4) in public locations and has allowed him to have contact with [A. and J.], although she also states that the "girls don't know him as their father". She indicated that [M.D.] currently lives in Carlisle, PA.

[Mother] dropped out of high school, but achieved her GED in 2009. She is currently taking on-line courses through Mississippi State University with the intent of achieving a Bachelor's Degree in Operational and Broadcast Meteorology. She just completed her first term.

As we stated in paragraph 4 above, we do believe that the Mother's fiancé, [T.H.], has been a stabilizing factor in her life. Absent [T.H.'s] involvement, we are not convinced that [Mother] could provide a safe, stable and structured home environment for her children, including specifically [Child] herein.

During his testimony, [Father] stated when the parties were married and residing together, [Mother] was constantly in contact, including daily phone calls, with a [J.D.], a former boyfriend. [J.D.] is an over-the-road truck driver. [Father] testified about an interlude that they had in June, 2014 at a hotel near the Williams Grove Speedway. [Father] kept asking [Mother] where she was going [to] stay and indicated that he could not get much of an answer out of her. She then stated that she was going to meet a friend, whom she later identified as [J.D.] and admitted that he was going to give her money for a motel room. [Father] later went to the motel room and saw [J.D.'s] clothes and shoes in the bathroom. [Father] stated that he had a "sick feeling" and then was told that we [sic] was not allowed to stay in the motel room that night with his wife.

[Mother] denied any romantic tryst, however, we do not find her testimony credible. [Mother] acknowledged that she had a hard time "getting over" [J.D.] when she was with [Father] and that [J.D.] is "still a friend" of hers.

[Mother] has lived at several different addresses since September, 2010, when she separated from [M.D.]

[Mother] acknowledged that her oldest daughter, [C.], is now sixteen (16) years of age and lives with her paternal grandparents. The father to this child is [C.S.] [Mother] does not have any custodial rights relative to this child. She was fourteen (14) years of age when she gave birth to this child.

[Father] also complained of the Mother smoking during her pregnancy with [Child]. [Mother] testified that [Father] never voiced such complaint, however, again we find [Mother's] testimony not to be credible.

Clearly, [Mother's] past history has been unstable and chaotic. She has exercised poor judgment in her past relationships with men. [T.H.] does appear to have provided some structure and stability in her life and that of her children, but again, their relationship is less than a year old.

What is of utmost concern to the court is the testimony of [L.B.], who testified on behalf of [Father]. [L.B.] is a stay-at-home mother with an 11 year old child. She lives in Claysburg and has known [Mother] since the family moved in next door in

- 14 -

March, 2014. They lived next door for approximately 7½ months until on or about October 7, 2014. During this course of time, there were occasions when [L.B.] babysat [Mother's] children. She also testified that [Mother] told her that she served as a "housekeeper and companion" for a gentleman and that she would do garden work and perform oral sex on him for $10.00 per hour. [Mother] also advised [L.B.] that she did not want [Father] to know that she had picked up this extra job. [L.B.] indicated that she met this gentleman, did not feel comfortable and never returned. She also advised [Mother] that this man was "not normal" and she voiced her concerns. She indicated [Mother] then quit this employment two (2) weeks later.

[L.B.] indicated that she was inside [Mother's] home approximately 20 to 30 times between the time period of March—October 2014. She described that one could barely walk through [Mother's] bedroom; the bathroom was total chaos, the children's room was rarely clean, and that the smell of cat litter boxes was "unimaginable". [L.B.] testified that [Mother] had three (3) cats, then a fourth and then a fifth cat as well as a dog. The house was exterminated in September 2014 and then again by the landlord after [Mother] and the family moved out in October 2014.

[L.B.] related different incidents where there was lack supervision by [Mother], specifically an incident when [J.] (then 4 years of age) was riding her bike, went out on the roadway and was almost hit by a vehicle; another incident in August or September 2014 when a man came to the house whom the children called "daddy" and [Mother] asked [L.B.] to keep the girls out of the house as she wanted to have sex with this individual. [T.H.] was at work at this time. [L.B.] told of another incident during a September 2014 evening when the two girls were outside playing and [Mother] was nowhere to be found. [L.B.] went inside the house and found [Child] alone in the house. She held him until [Mother] came back home approximately ½ hour later.

Around Mother's Day, 2014, [L.B.] met [Mother's] mother [("Maternal Grandmother")]. [L.B.] indicated that [Mother] was talking about sex, dildos and handcuffs[,] and she brought out handcuffs and whips and said she was going to use them on [T.H.] that night. During this conversation, the girls were

- 15 -

present in the living room[,] and [Maternal Grandmother] was holding [Child].

[L.B.] related another incident that occurred in late summer, 2014 when [Mother] told her that they had champagne and wine coolers and had "a heck of night drinking and partying". [Mother] said she sent the girls to bed early and remarked[,] "I hope you didn't hear anything", explaining that they were running outside naked[,] and that [Maternal Grandmother] videotaped she and [T.H.] while they were having sex on the back deck. [L.B.] testified that [Maternal Grandmother] tried to show her the video on her cell phone but that [Mother] told her not to.

[L.B.] also testified that she has seen the girls sit around the house naked with [T.H.] putting lotion on them. She has heard [Mother] scream and swear and hit the children with a wooden spoon.

[L.B.] testified that she came to court to testify "for the welfare of all three children, especially [Child]". She wants to see [Child] grow up in a good home environment. [L.B.] was concerned as to the children's welfare during the summer of 2014 and did contact Blair County Children, Youth & Families. [L.B.] also indicated that the police have visited her on a few occasions to discuss [Mother] and the living environment for the children.

We are satisfied that [L.B.] acted with good intentions in coming to court and testifying on behalf of [Father]. Her testimony was very detailed and specific. [Mother] acknowledged that she and [L.B.] had a friendly relationship before going their separate ways. [Mother] never provided any plausible explanation as to why their friendship ended, adding further credence to the testimony of [L.B.]

[L.B.] also confirmed that she just recently met [Father] and that she is not friends with him or his family.

We find [L.B's] testimony to be credible and, therefore, have serious concerns as to the home environment that [Mother] has, and will provide into the future for [Child]. We are fully satisfied that [Father] has, and will continue to provide a healthy home environment for [Child]. We were impressed with [Father]

- 16 -

and are encouraged by the fact that he seems to have a positive relationship with his parents and extended family members, who together will provide a positive source of support for this young child growing up.

**(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child?**

We find that both parties have, and would continue to attend to the daily physical, emotional, developmental, educational and special needs of the child. [Child] is healthy and developmentally on track.

**(11) The proximity of the residence of the parties.**

The parties live approximately 10 minutes away from each other.

**(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.**

[Father] has his parents and other extended family members available in the area to care for [Child]. Neither [Mother] nor [T.H.] have any family in the area, therefore, it would be necessary for them to utilize a daycare or a caregiver if both are working and /or otherwise unavailable.

**(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another.**

Generally, since [Child's] birth, both parties have been able to engage in civil communication with each other and have shown a willingness to be flexible and cooperate concerning [Child].

**(14) The history of drug or alcohol abuse of a party or member of a party's household.**

This is a non-factor for both parties.

**(15) The mental and physical condition of a party or member of a party's household.**

This is a non-factor for both parties, other than [Mother] is currently engaged in physical therapy as she is recovering from knee surgery.

**(16) Any other relevant factors.**

There was much testimony spent on issues involving the paternal grandparents, especially the paternal grandfather, and [Mother]. In summary, we accept the fact that they do not have a positive relationship and that there is not an open and civil line of communication between them. However, based upon the evidence adduced during both of our hearings, we can understand why the paternal grandparents have concerns relative to [Mother's] home environment and past history involving men, including specifically her interlude with [J.D.] while she was married and cohabitating with . . . [Father].

As a word of caution, we would strongly encourage the paternal grandparents (especially the paternal grandfather) and [Mother] to be civil with each other and avoid making any derogatory and disparaging comments about the other, especially in the presence of [Child].

### *Summary/Conclusion:*

In considering all relevant factors to determine custody as set forth in 23 Pa.C.S.A. §5328, and taking into consideration the paramount concern in a child custody case, i.e., the best interests of the child, [Child], we are going to award [Father] primary residential custody. In review of [Father's] circumstances, we find nothing but positive factors. [Father] has no prior drug and alcohol history nor criminal involvement. He owns his own home and is stable and self-supporting. He has a close relationship with his parents and extended family members, many of whom are in the Blair County area. He has been totally devoted and committed to his son, being present at the time of his birth and attending all medical appointments except for the brief two (2) month period of time that the consensual PFA Order was in effect. He has provided, and from all accounts will continue to provide, a <u>healthy</u>, <u>safe</u>, <u>stable</u> and <u>secure</u> <u>home</u> <u>environment</u> for his son.

[Mother] does appear to be taking some steps to improve the quality of her life. We certainly give her credit for obtaining

her GED and participating in college courses on-line through Mississippi State University. As we stated above, [T.H.], who has a good job and significant income has brought some stability into her life. However, their relationship has only been in existence for a little over one (1) year. Based upon [Mother's] prior history, we have some concerns as to the future of this relationship.

[Mother] has had a chaotic history, including involvement with the criminal justice system and Dauphin County Children Youth & Services. Her parental rights were terminated for three (3) of her children. She has made questionable choices concerning her relationships with men. She has had instability regarding her housing and employment. We are also very concerned with the incidents as testified to by [L.B.], whose testimony we found to be credible. It is important to note that some of incidents that [L.B.] testified to occurred after [Mother] and [T.H.] began their relationship. [Mother] and [T.H.] have lived together since June, 2014, and they lived next door to [L.B.] until October, 2014.

Based upon [Father's] self-employment, he is readily available the months of November through May to care for his son. Even during his busy season, his work schedule is flexible. It is important that [Child] maintain his relationship and bond with his two (2) half-sisters, [J. and A.] Therefore, we will attempt to construct a custody schedule that allows [Mother] and her family significant time with [Child].

As we stated in court, we commend the parties for their ability to engage in civil communication over the years. We are especially impressed that since the Order was originally entered, there were no prior petitions for contempt or special relief. It is our hope that upon entry of this Order, the parties can continue to communicate and cooperate with each other, and be flexible relative to the custody schedule. We trust that they will continue to keep in mind [Child's] best interests and welfare first and foremost.

Trial Court Opinion and Order, 6/8/15, at 3–12 (internal citations omitted)

(emphasis in original).

As noted, Mother combines argument on her first and third issues. Mother's Brief at 3, 5. She contends that the trial court committed an error of law or abused its discretion by awarding Father primary physical custody of Child because the evidence showed that she was the proper parent to have primary physical custody, and Father did not produce sufficient evidence to warrant an award of primary physical custody to him. Mother's Brief at 5. Mother challenges the weight that the trial court placed on the testimonial evidence in relation to the section 5328(a) custody/best interest factors.

Mother does not dispute the trial court's determination regarding the weight it assigned to section 5328(a)(1), (2), (7), (8), (1), (11), (14), (15), or (16) based on the testimonial evidence. Rather, Mother specifically challenges the weight that the trial court placed on the testimonial evidence with regard to section 5328(a)(3), asserting that she has been Child's primary caregiver and the provider of parental duties for Child under the February 4, 2014 custody order and its Addendum dated June 17, 2014. Mother's Brief at 7. In her separately-numbered fifth issue in her brief, Mother asserts that the trial court should have accorded more weight to her performance of parental duties as Child's primary caretaker, citing **M.J.M. v. M.L.G.**, 63 A.3d 331, 339 (Pa. Super. 2013). Mother's Brief at 15–16. In a related argument, Mother argues that because she had primary physical custody of Child under the June 2014 custody order and Addendum, the trial

court should have weighed considerations of stability under section 5328(a)(4) in her favor. Mother's Brief at 7.

In **M.J.M.**, this Court considered the mother's argument that the trial court erred by failing to afford proper consideration to her role as the child's primary caretaker. The mother had desired for the trial court to afford more weight to her role as the child's primary caretaker. A panel of this Court reasoned that the Act indicated that the only factors given weighted consideration are factors that affect the safety of the child. **M.J.M.**, 63 A.3d at 338. The **M.J.M.** panel explained:

> The language of [the Act] is clear. It explicitly provides that all relevant factors shall be considered by the trial court, and the only factors that should be given "weighted consideration" are factors that "affect the safety of the child[.]" *Id*. "When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa.C.S.A. § 1921(b); *see also Ario v. Ingram Micro, Inc.*, 600 Pa. 305, 317, 965 A.2d 1194, 1201 (2009). If the Pennsylvania Legislature intended for extra consideration be given to one parent because of his or her role as the primary caretaker, it would have included language to that effect. Stated another way, the absence of such language indicates that our Legislature has rejected the notion that in analyzing both parents, additional consideration should be given to one because he or she has been the primary caretaker.
>
> Furthermore, the consideration the primary caretaker doctrine sought to address (which parent spent more time providing day-to-day care for a young child) is addressed implicitly in the enumerated factors. *See, e.g.*, 23 Pa.C.S.A. §§ 5328(a)(3) ("The parental duties performed by each party on behalf of the child."); (a)(4) ("The need for stability and continuity in the child's education, family life and community life."). The considerations embraced by the primary caretaker doctrine have been woven into the statutory factors, such that they have become part and parcel of the mandatory inquiry.

In short, the Legislature has created a mandatory inquiry to aid trial courts in determining the best interests of the child in a custody dispute. In doing so, it articulated the components of a parent's obligations and characteristics, and a child's needs and welfare, that must be incorporated in the trial court's custody decision where the parents are incapable of doing so on their own. In setting forth these factors, the Legislature has required the trial court to give additional weight *only* to factors that it finds affect the safety of the child. This language is clear, and we cannot expand it to provide that a trial court must also give weighted consideration to a party's role as primary caretaker. We simply cannot graft the judicially-created primary caretaker doctrine on to the inquiry that the Legislature has established, and so we conclude that the primary caretaker doctrine, insofar as it required positive emphasis on the primary caretaker's status, is no longer viable.

We hasten to add that this conclusion does not mean that a trial court cannot consider a parent's role as the primary caretaker when engaging in the statutorily-guided inquiry. As discussed above, a trial court will necessarily consider a parent's status as a primary caretaker implicitly as it considers the section 5328(a) factors, and to the extent the trial court finds it necessary to explicitly consider one parent's role as the primary caretaker, it is free to do so under subsection (a)(16). It is within the trial court's purview as the finder of fact to determine which factors are most salient and critical in each particular case. *See A.D. v. M.A.B.*, 989 A.2d 32, 35-36 (Pa. Super. 2010) ("In reviewing a custody order . . . our role does not include making independent factual determinations. . . . In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand."). Our decision here does not change that.

**M.J.M**, 63 A.3d at 338–339 (footnote omitted).

Based on this Court's discussion of the primary caretaker doctrine in

**M.J.M.**, we find no merit to Mother's contentions regarding the weight that

the trial court afforded to the testimony related to factors 5328(a)(3) and

(4), and the primary caretaker doctrine. We find that the trial court's

conclusions are not unreasonable, as shown by the evidence of record, and we find no error of law on the part of the trial court. We, therefore, will not disturb the trial court's determination as to the factors set forth in 5328(a)(3) and (4). *C.R.F.*, 45 A.3d at 443.

Next, Mother asserts that the trial court should have afforded additional weight to the fact that she lives with her fiancé, T.H., and her two daughters, who are available to assist her with Child. She argues that the trial court should have found that she has more in-home support from her family members than Father, who lives alone but has extended family members living nearby. Accordingly, Mother urges that the trial court should have weighed the factors set forth in section 5328(a)(5) and (12) in her favor. Mother's Brief at 7–8.

Again, Mother is requesting this Court to disturb the trial court's weight determinations with regard to these factors. As we stated in *M.J.M.*, this Court's role does not include making independent factual determinations, and, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge, who viewed and assessed the witnesses first-hand. Here, we find that the trial court's conclusions are not unreasonable as shown by the evidence of record, and we find no error of law on the part of the trial court. Thus, we will not disturb the trial court's determination as to the factors set forth in section 5328(a)(5) and (12). *C.R.F.*, 45 A.3d at 443.

- 23 -

Mother avers that the trial court should have found that the testimonial evidence with regard to section 5328(a)(6), Child's relationships with his half-siblings, weighs in favor of Mother retaining primary physical custody of Child. Mother's Brief at 8. In her separately-numbered second issue in her brief, Mother argues that the trial court should have accorded more weight to the consideration of raising the half-siblings and Child together under the "family unity" or "whole family" doctrine, citing **M.J.M.**, 63 A.3d 331. Mother's Brief at 15–16.

For the reasons expressed in **M.J.M.** concerning the viability of the primary caretaker doctrine in light of the Act, we find no merit to Mother's argument concerning the family unity or whole family doctrine. We find that the trial court's conclusions are not unreasonable, as shown by the evidence of record, and we find no error of law on the part of the trial court. Therefore, we will not disturb the trial court's determination. **C.R.F.**, 45 A.3d at 443.

Finally, Mother challenges the trial court's credibility and weight placed on the section 5328(a)(9) factor. She complains that the trial court placed undue weight on this factor and accepted unreliable testimony from L.B., who Mother posits did not witness the incidents that she described and had not complained to police. Mother's Brief at 8–10. Mother urges that L.B. could not have observed any of the incidents after October of 2014, because Mother moved from L.B.'s residential area. **Id.** at 9. Mother asserts that

there was no testimony of any negative effect upon the children currently residing in her home due to any of the alleged incidents described by L.B. *Id.* at 9–10. In her related fourth issue in her brief, Mother avers that the trial court committed reversible error in basing its decision on Mother's past conduct because there was no ongoing negative effect on Child or his half-siblings. Mother's Brief at 12–13. Mother contends that the trial court improperly considered her past history, citing *In re Leskovich*, 385 A.2d 373, 377 (Pa. Super. 1978), a case which predated the Act.

We find no merit to Mother's claims. The trial court did not base its custody decision on Mother's past actions. Rather, the trial court considered all of the evidence concerning Mother's actions, including those from the summer and early fall months preceding the custody hearings. For the reasons expressed in *M.J.M.*, we find no expression of the Legislature in the Act of any test regarding an ongoing negative effect on children. The Act sets forth only the sixteen-factor custody/best interest test. We find that the trial court's conclusions in this matter are not unreasonable, as shown by the evidence of record, and we find no error of law on the part of the trial court. Therefore, we will not disturb the trial court's determination. *C.R.F.*, 45 A.3d at 443.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/8/2016