IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 84 MAP 2024 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Superior Court at No. 520 MDA 2022 |
| | : | dated November 28, 2023, Affirming |
| v. | : | the Order of the York County Court of |
| | : | Common Pleas, Criminal Division, at |
| | : | No. CP-67-CR-0007632-2018, dated |
| STUART HARRISON, | : | November 1, 2021. |
| | : | |
| Appellee | : | SUBMITTED: March 25, 2025 |

## OPINION

**CHIEF JUSTICE TODD**                         **DECIDED: April 30, 2026**

In this appeal by allowance, our Court is asked to determine whether the Superior Court erred in affirming the trial court's denial of the Commonwealth's motion to *nolle prosequi*[1] criminal charges of negligent simple assault against Appellee, Stuart Harrison, an ex-police officer, because the trial court allegedly failed to apply the governing legal standard established by our Court in *Commonwealth v. Reinhart*, 353 A.2d 848, 853 (Pa. 1976), for the review of such motions. After careful review, we conclude that the trial

---

[1] As our Court has explained, "[a] *nolle prosequi* is a voluntary withdrawal by a prosecuting attorney of proceedings on a particular criminal bill or information, which at anytime in the future [within the statute of limitations] can be lifted upon appropriate motion in order to permit a revival of the original criminal bill or information." *Commonwealth v. Ahearn,* 670 A.2d 133, 135 (Pa. 1996).

court applied the correct standard in denying the Commonwealth's motion. We therefore affirm the order of the Superior Court.

## I. Factual and Procedural History

On the afternoon of May 30, 2018, Ryan Smith walked into a branch of Santander Bank located in the City of York, Pennsylvania. Smith requested that he be allowed to withdraw money from his savings account at the bank, but bank employees refused the request because Smith failed to furnish suitable identification, as required by bank policy. However, Smith was insistent that his request be honored, and he remained in the bank and continued to argue with its employees. In response, the bank's manager called 911 to have Smith removed from the premises. Harrison, then employed as a police officer for the now disbanded Southwestern Regional Police Department of York County, was dispatched in response to the call.

When Officer Harrison arrived at the bank, he was met by the manager who identified Smith; Harrison then approached Smith, whom he recalled appeared "frustrated." Affidavit of Probable Cause, 11/30/18, at 2 (R.R. at 10a).[2] Harrison informed Smith that, if he wished to withdraw money, he would have to present identification. Smith began arguing with Harrison, stating that he did not have any photo identification, and refused Harrison's request to leave the bank. *Id.*

At this point, Harrison informed Smith that he was under arrest, and the officer, who was right-handed, drew his Taser weapon[3] from a holster that he carried on the left

---

[2] R.R. denotes the reproduced record filed in this matter.
[3] A Taser is a handheld device that is designed to incapacitate an individual by delivering a 50,000-volt electric charge into the individual's body, which temporarily disrupts the normal functioning of his or her neuromuscular systems. The charge is normally delivered through two electronic probes held in a cartridge inside the Taser, which are expelled from the barrel of the Taser via the use of compressed nitrogen when the Taser's trigger is pulled. The probes, which are designed to penetrate clothing and imbed themselves in skin, are attached to thin wires through which the high voltage charge generated in the (continued…)

side of his duty belt.  After releasing the Taser from his belt holster, Officer Harrison pressed the trigger, which resulted in its probes being expelled and impacting Smith's torso; however, this deployment failed to disable Smith.  *Id.* at 3.  Officer Harrison proceeded to immediately request backup assistance from other officers on his radio, reloaded a second cartridge into the Taser, and once more pressed its trigger, but again the probes failed to penetrate Smith's skin and deliver sufficient charge to incapacitate him.  *Id.*

Shortly thereafter, a second police officer, Officer Michael Matthews, also of the Southwestern Regional Police Department, arrived on the scene in response to Officer Harrison's call.  The officers wrestled Smith to the ground, and, after Officer Matthews deployed the probes of his own Taser weapon into Smith's back, they handcuffed him.  *Id.*  The officers then lifted Smith back to his feet and escorted him out of the bank towards Officer Matthews' patrol car.  Once there, the officers could not get Smith to lower his head and bend down to get into the back seat, despite Officer Harrison administering several "knee strikes" to Smith.  *Id.*

At this point, Officer Harrison informed Officer Matthews that he was going to "drive-stun" Smith in the thigh with his Taser.  However, instead of withdrawing the Taser from his duty belt, Officer Harrison instead drew his service firearm, a semiautomatic 9 mm Glock 17 pistol which he was carrying in a holster on the right side of his duty belt.  *Id.* at 2.  After releasing the safety of the pistol holster, Officer Harrison removed the

_____

main body of the weapon is delivered into the skin.  A Taser may also function as a "stun gun" if its undeployed probes are directly pressed against a person's body by the holder of the weapon while pulling and holding the trigger.  William C. Plouffe, *Taser*, *available at* https://www.britannica.com/topic/TASER.  This technique is sometimes referred to as a "drive-stun," which frequently causes the person who has been subjected to it to experience pain and the inability to tense his or her muscles.  *See* Federal Law Enforcement Training Centers, Use of Force Part VI: Intermediate Weapons, *available at* https://www.fletc.gov/use-force-part-vi.

firearm, placed it against Smith's thigh, and pulled the trigger, shooting Smith in his thigh. *Id.* at 3. In response, Smith yelled, "Dude why'd you shoot me?" *Id.* Officer Harrison then re-holstered his handgun and obtained a first aid kit from his police cruiser. Officer Matthews began to apply direct pressure to the bleeding wound, and Officer Harrison radioed his dispatcher, relaying that there had been a "shooting incident," and he requested that an EMS unit be dispatched. *Id.* Smith was transported by the responding EMS unit to a local hospital, where he spent 17 days recovering from the gunshot wound.

Smith's shooting was investigated by state police troopers who interviewed Officer Harrison and Officer Matthews, as well as three other witnesses to the incident: Christine Smith, who is Smith's mother; Amanda Hendrickson-Cozio, who was employed as a cleaner by the bank; and a bank customer, Harry Harrington.

Officer Harrison related to the investigators that he thought he had placed his Taser against Smith's thigh as he was struggling to get Smith into the car, but when he pulled the trigger and heard the sound, he realized he had discharged his gun. *Id.* Officer Harrison stated to the investigators "that it was not his intent to use his firearm." *Id.*

Based on their investigation, the troopers determined that the Taser is yellow and weighed 227 grams, whereas the Glock 17 used by Officer Harrison was black and weighed 905 grams. *Id.* at 2. They also found that the holster in which the Taser was carried by Officer Harrison had a safety retention button that needed to be depressed to release it from the holster, and that, because the holster was on the left side of his duty belt, in order for Officer Harrison to draw the Taser, he had to reach across his body and press the release button, which was located on the side of the holster away from his body. *Id.* By contrast, Officer Harrison carried his Glock 17 in a holster on the right side of his duty belt, and, while that holster also had a safety release button, it was positioned on the side of the holster closest to his body. *Id.*

The state police troopers additionally noted that Officer Harrison was a certified firearms and Taser instructor for the Southwestern Regional Police, and that he had completed training courses in the handling of both types of weapons within the preceding six years. *Id.* at 7.

Mrs. Smith recounted to the troopers that, on the day of the shooting, Smith, her son, was acting confused, and "seemed delusional," noting that he had been released from the hospital the previous day. *Id.* at 5. She recalled he erroneously believed he had a bank account, and, after informing her that he was going to get money out of it, left the house against her wishes. This prompted her to begin searching for him at local banks, and she arrived at Santander Bank just as her son was being led out of the building in handcuffs by the officers. She related that she informed the officers that Smith was her son and that he had a mental illness. *Id.* She observed the officers place her son in the rear seat with his legs outside of the door, while attempting to get his legs into the vehicle. She heard a loud bang, prompting her to exclaim, "[y]ou shot my son!" to which Officer Harrison responded, "I didn't mean to." *Id.*

Hendrickson-Cozio told the investigators that, when she arrived at the bank to begin her cleaning work, she saw Smith, while handcuffed, being brought by the officers from the bank to the police car, as well as Smith's mother yelling to the officers "that's my son, he's not in the right frame of mind!" *Id.* at 5. Hendrickson-Cozio informed the investigators that Smith was sitting in the backseat of the police car with his head and feet outside of the car when Officer Harrison "shot him." *Id.* at 6.

The third witness, Harry Harrington, was inside the bank when the altercation between Smith and the employees began, and he told the investigators that he watched Officer Harrison's interaction with Smith and the efforts of Officer Harrison and Officer Matthews to take him into custody while inside. Harrington related that, after the three

had moved outside, he followed. Harrington recalled that, during a struggle, Officer Harrison "pulled out his gun . . . pointed it towards [Smith's] leg and shot." *Id.*

The troopers reviewed all available video footage, and, while there was video taken of the incident inside of the bank, none captured the events that transpired in the parking lot.

Based on their investigation, the troopers charged Harrison with one count of the offense of negligent simple assault, a second-degree misdemeanor, which is defined as:

> **(a) Offense defined.--**Except as provided under section 2702 (relating to aggravated assault), a person is guilty of assault if he:
>
> * * *
>
> (2) negligently causes bodily injury to another with a deadly weapon[.]

18 Pa.C.S. § 2701(a).

A preliminary hearing was held on December 21, 2018, at which Hendrickson-Cozio and Mrs. Smith testified consistent with their statements to the investigating troopers. One of the investigating troopers, Daniel Weldon, also testified. In addition to confirming the information contained in his affidavit of probable cause, Trooper Weldon also relayed that the Southwestern Regional Police Department had a policy regarding the use of Tasers that prohibited their use on handcuffed individuals taken into custody unless those individuals engage in "overtly assaultive behavior that cannot be reasonably dealt with in any other less intrusive fashion." N.T., 12/21/18, at 74-75. After considering this evidence, the magistrate held the charges against Harrison for trial.

However, the Commonwealth, by and through the York County District Attorney's Office, did not proceed to trial on these charges, but, instead, on May 19, 2020, filed a motion for *nolle prosequi*. In this motion, the Commonwealth asserted that terminating the prosecution was "in the interests of justice." Commonwealth First Motion for *Nolle*

*Prosequi,* 5/19/20, at 1.[4]  In support of this contention, the Commonwealth relied upon the general considerations for the imposition of a sentence set forth in the Sentencing Code, which directs a sentencing court to consider "the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant" in crafting a defendant's sentence.  *Id*. at 2 (quoting 42 Pa.C.S. § 9721(b)).  With respect to the protection of the public and the rehabilitative needs of the defendant, the Commonwealth highlighted Harrison's 16-year career as a police officer, his remorse, the unlikelihood of recidivism, the lack of need for protection of the public and the minimal need for rehabilitation because the shooting was a mistake, and his subsequent agreement to the Commonwealth's request to address the shooting for two police cadet classes to instruct them how to prevent similar errors when answering police calls involving individuals with mental health issues.  *Id.* at 2-4.

Turning to the victim's needs, the Commonwealth averred that it had discussions with Mrs. Smith, whom the Commonwealth considered to be a victim of the shooting because she witnessed her son being shot, in which she stated that she desired two outcomes from the case:  that Harrison no longer carry a firearm while working as a police officer, and that the circumstances of the case be used as an educational example for police officers in how to properly deal with mentally ill people so as to avoid this outcome in the future.  *Id.* at 5.  The Commonwealth submitted that these two objectives had been met, as Harrison was no longer a police officer, given that his employer — the Southwestern Regional Police Department — had been disbanded, partly because of this incident, and Harrison had conducted the aforementioned police cadet training.  While acknowledging the desire of Mrs. Smith to continue the prosecution and obtain a

---

[4]  This motion is unpaginated.

conviction, the Commonwealth asserted that, in its view, to continue the prosecution and obtain a conviction would be "punishment for punishment's sake." *Id.* at 6.[5]

The trial court, the President Judge of York County the Honorable Maria Musti Cook, conducted a hearing on this motion on June 15, 2020. At this hearing, the trial court heard testimony from Smith, who informed the court that he was unaware of the Commonwealth's motion, as he had never been contacted by anyone from the District Attorney's Office, and that he only learned of the proceedings when he read about them in the newspaper. N.T., 6/15/20, at 6. Smith indicated to the court that he was displeased with the District Attorney's decision to *nolle prosequi* the charges, as he recounted to the court that his injuries from the shooting were life threatening and that he had a difficult medical recovery, as well as the fact that he still suffered emotional distress and public shame from the incident. *Id.* at 19-20. Smith also expressed his belief that the charge of simple assault for Harrison was too lenient under the circumstances in that it did not give sufficient consideration to the nature of the shooting, *i.e.*, that it was unjustified because he was handcuffed at the time in the back of the police car, and did not pose a threat to anyone. Smith stated that he was upset because he perceived that his status as the true victim was being minimized while, in his view, the District Attorney, in justifying his decision, was improperly focused on the negative impact of the shooting on Harrison's life. *Id.* at 20-22.

Smith's mother also testified that, while she had discussed the motion with representatives of the District Attorney's Office, she indicated that she disapproved of the decision to dispose of the case in this manner because, from her perspective, it would not result in justice being served. She indicated that, to her, it would have been preferable if the Commonwealth had chosen to offer a guilty plea to Harrison for the charge, as, had

---

[5] The motion did not allege that the Commonwealth had spoken with the shooting victim, Smith.

he accepted it, it would at least have been an acknowledgement of guilt on his part, which was what she was seeking. She informed the trial court that, under those circumstances, she would not have objected if the court considered all the factors which the Commonwealth cited in its motion in the context of deciding an appropriate sentence after such a plea. *Id.* at 26.

The then-District Attorney of York County, Dave Sunday, also testified at the hearing. He apologized to the court for lack of direct communication with Smith, explaining that there was regular communication between an assistant district attorney in his office and Smith's mother who possessed a valid power of attorney for him, and also with Smith's personal injury attorney, so he assumed that Smith would be readily kept apprised of the developments in the case. *Id.* at 3-4. On the merits of his motion, the District Attorney defended his request, noting that his first assistant had discussed with Mrs. Smith why, under the particular facts of the shooting, Harrison was charged with the offense of negligent simple assault and its legal classification under the Crimes Code as a second-degree misdemeanor. He explained that a charge of this nature was, in his experience, unique in that it was rarely brought as a stand-alone charge. *Id.* at 11. Nevertheless, he stated that he felt that bringing the charge was the right thing to do under the circumstances. *Id.* at 11-12.

Once the charges were brought, the District Attorney related that he evaluated the available options, to either bring the case to trial or utilize an alternative diversionary disposition, which he indicated was his preference for handling these types of misdemeanors. *Id.* at 12. He testified that, in his experience, even if the case had gone to trial and he had obtained a conviction, the sentencing guidelines would have resulted in a sentence of probation of a year or less, or perhaps no punishment at all. *Id.* Thus, given Mrs. Smith's wishes that Harrison no longer be a police officer, and Harrison's

stated desire to rectify the situation as best as he could, the District Attorney recounted that, in his opinion, Harrison's instruction of cadets about his experience, coupled with the fact that he was no longer a police officer and would forever be linked to this incident through internet searches, convinced him that Harrison had incurred sufficient penalties. *Id*. at 13-15. Consequently, according to the District Attorney, for all of these reasons he decided to seek *nolle prosequi* of the case.

At the conclusion of the hearing, the trial court orally denied the Commonwealth's motion. In a later written opinion, the trial court observed that the Commonwealth had conceded "several times during the hearing that [Harrison]'s actions amounted to criminal negligence." Trial Court Opinion, 6/10/22, at 5.[6] The trial court explained:

> [T]his is not a case where evidence is not available to the Commonwealth to prosecute its case. Rather, this is a case where the Commonwealth wanted to act as fact-finder and sentencing judge to determine that a diversionary program would be an appropriate consequence for Defendant, or that Defendant had already performed acts sufficient to satisfy any legal consequence for his alleged actions, with no level of accountability by Defendant on the record. While those arguments could be made to the Court at the appropriate time, this Court found that such arguments were not a valid basis to grant *nolle prosequi*.

*Id.* The trial court also took notice of Smith's strenuous objection to entry of the *nolle prosequi* based on his lack of prior notice that the Commonwealth was taking such action, and Smith's opinion that he did not receive his full measure of justice because of what he perceived to be the Commonwealth's disregard of his significant injuries and the emotional impact of the shooting. *Id.*

Thereafter, the Commonwealth filed another motion, joined by Harrison, asking the trial court to amend her order to allow an immediate interlocutory appeal to the Superior

---

[6] The trial court opinion is unpaginated.

Court. The Commonwealth alleged that the trial court erred in applying a *de novo* standard of review of its motion for *nolle prosequi*, which considered only whether the evidence was legally sufficient to proceed with a prosecution. Commonwealth Motion to Amend Order, 7/9/20, at 2.[7] The Commonwealth contended that this was the incorrect standard, claiming its decision not to prosecute was based on policy considerations, specifically the remedial efforts undertaken by Harrison after being charged and his lack of rehabilitation needs. *Id.* at 3. Thus, the Commonwealth claimed the trial court should review its decision for an abuse of discretion. *Id.*

The trial court denied this motion. The Commonwealth then sought permission to appeal the trial court's order denying the motion for *nolle prosequi* from the Superior Court, which that court denied.

Thereafter, on September 14, 2021, the Commonwealth filed a second motion for *nolle prosequi* — which is at issue in this appeal — alleging that it had an ethical duty to terminate the prosecution because it could not satisfy its burden of proof. More specifically, the Commonwealth asserted that the prosecution could not proceed because Harry Harrington, who, as discussed above, had witnessed the police confrontation and shooting, but had not testified at Harrison's preliminary hearing, died on March 23, 2019. The Commonwealth claimed:

> Mr. Harrington is the only Commonwealth witness that observed the entire chain and sequence of events, to include the actual shooting itself, and is the only witness not affiliated with the victim and his family or with the defendant and the police department, thus rendering his testimony neutral and free from any allegation of bias. In fact, Mr. Harrington's testimony was the key and critical evidence that led to charges in this matter.

---

[7] This motion is unpaginated.

Commonwealth Second Motion for *Nolle Prosequi*, 9/14/21 (R.R. at 177a). The Commonwealth further maintained that, because the shooting was not captured on video, Harrington was "the only independent witness who could testify as to the circumstances surrounding the shooting," and that without his testimony it "cannot meet its evidentiary burden in establishing that the Defendant acted with criminal negligence in [this] matter." *Id.*

The trial court conducted a hearing on this motion on November 1, 2021. During that hearing, the trial court characterized the motion as "quite lame," observing that Harrington's death preceded the Commonwealth's filing of its first petition for *nolle prosequi*, and yet the Commonwealth did not allege therein that his death impacted its ability to prosecute the case. N.T., 11/1/21, at 3. The trial court also noted that Harrington's testimony was unnecessary to secure a conviction, given that there were other witnesses available to testify, such as the victim, his mother, and other bank personnel.

In its subsequent written opinion, the trial court elaborated that the Commonwealth's contention that Harrington was the sole independent witness whose interests did not align with either the victim or with the police was "based upon inaccurate facts." Trial Court Opinion, 6/10/22, at 8. The court reminded that Hendrickson-Cozio, who was an employee of the bank, testified at the preliminary hearing that she "saw Smith being led to the patrol car by the officers, saw Smith seated in the police vehicle and saw Defendant shoot Smith." *Id.* The court also found that there was independent video evidence of what transpired in the bank, and reiterated the availability of the other aforementioned witnesses to the shooting. The court found that even though "said witnesses may not be independent of both sides of the case, the weight and credibility of their testimony is a consideration for the fact finder, be it judge or jury." *Id.* at 9.

The trial court noted that the Commonwealth argued during the preliminary hearing that the evidence demonstrated sufficient probable cause to support the charges, and the magisterial district judge agreed. Further, the trial court expressed its strong disagreement with what it termed the Commonwealth's "revised assessment of the evidence." *Id.* at 9-10. The court, after reciting the evidence discussed above that could be used to establish Harrison's guilt, observed that "[t]he Commonwealth regularly proceeds to trial with much less evidence and often with nothing more than a 'he said-she said' scenario, leaving to the fact-finder the duty to ascertain the facts." *Id.* at 10.

By contrast, the trial court found that, here, "[t]he Commonwealth changed its position on this case after the preliminary hearing and continues to stall in bringing the matter to trial, which is supported by the fact that the Commonwealth did not even discover the witness had died until two years after the fact." *Id.* The court concluded "[t]his has never been a case where evidence was insufficient," and, in apparent reference to the facts developed at the hearing on the Commonwealth's first unsuccessful effort to *nolle prosequi* the case, reminded that "[t]he Commonwealth negotiated a plea agreement with defense counsel that included a *nolle prosequi* of the charges and now wants that agreement enforced." *Id.* at 10-11. The court recounted that it had declined to do so because the agreement failed to "give consideration to Victim's rights and Victim was opposed to the negotiated plea agreement." *Id.* at 11.

Additionally, as is relevant to the present appeal, the trial court addressed what it considered to be the Commonwealth's contention that the court could not independently evaluate the evidence of record to determine if the Commonwealth's motion for *nolle prosequi* should be granted. The trial court disagreed, finding that acceptance of this

argument would suggest that Pa.R.Crim.P. 585[8] "serves no legitimate purpose," *id.*, and would negate the clear command of Section 8932 of the Judicial Code, which states that

> After the commencement of a criminal matter by the filing of an information or otherwise, the district attorney shall not enter a *nolle prosequi* or dispose of the matter or discharge a prisoner from custody by means of a proceeding in lieu of a plea or trial without having obtained the approval of the court.

42 Pa.C.S. § 8932.

The trial court emphasized that, under these provisions, its role was not merely to be a "rubber stamp for the Commonwealth." Trial Court Opinion, 6/10/22, at 12. In support, the trial court cited our decision in *Reinhart*, 353 A.2d at 853 (holding that "there are two factors to be considered when a request for a *nolle prosequi* is made: (1) is the reason given by the Commonwealth for requesting the *nolle prosequi* valid and reasonable, and (2) does the defendant, at the time the *nolle prosequi* is requested, have a valid speedy trial claim?" (footnotes omitted)).

Regarding the Commonwealth's separation of powers claim, the trial court cited the Superior Court's decision in *Commonwealth v. Stivala*, 645 A.2d 257, 261 (Pa. Super. 1994), wherein a panel of that tribunal rejected a similar separation of powers challenge brought by an individual convicted of second-degree murder to the trial court's refusal to grant the Commonwealth's request for *nolle prosequi*. Because the Commonwealth's motion therein was based entirely on its assertion that the evidence was legally insufficient for it to establish a *prima facie* case at trial, the *Stivala* court found guidance

---

[8] This rule provides, in relevant part:
> (A) Upon motion of the attorney for the Commonwealth, the court may, in open court, order a *nolle prosequi* of one or more charges notwithstanding the objection of any person.

Pa.R.Crim.P. 585(A).

in our decision in *Commonwealth v. Benz*, 565 A.2d 764 (Pa. 1989) (OAJC),[9] in which a plurality of our Court opined that a trial court could, in the context of reviewing the Commonwealth's denial of a private criminal complaint on the basis that it was legally insufficient to support a *prima facie* case, independently evaluate the evidence and determine whether it supported the Commonwealth's claim without offending the constitutional principle of separation of powers. Based thereon, the *Stivala* court reasoned that a trial court was likewise empowered to evaluate the evidence whenever the Commonwealth asserts its insufficiency as a basis for seeking *nolle prosequi*.

Based on all of these considerations, the trial court denied the Commonwealth's second motion for a *nolle prosequi*. The Commonwealth again requested that the trial court certify the order for interlocutory appeal, but, once more, the trial court refused. The Commonwealth and Harrison, whose legal positions were aligned in desiring that the case be *nolle prossed*, petitioned the Superior Court, pursuant to 42 Pa.C.S. § 702(b) (permitting an appellate court to allow a discretionary appeal from an interlocutory order), for permission to appeal. That tribunal granted their request and consolidated their appeals for adjudication.

In their appeal to the Superior Court, the Commonwealth and Harrison contended that: (1) judicial review of a motion for *nolle prosequi* is akin to judicial review of a prosecutor's refusal to file a private criminal complaint, such that the trial court erred by failing to apply the deferential standard of review set forth in *In re Ajaj*, 288 A.3d 94, 109 (Pa. 2023) (holding that a trial court may overturn a prosecutor's decision to disapprove a private criminal complaint only "if the private complainant demonstrates that the disapproval decision amounted to bad faith, occurred due to fraud, or was

---

[9] In this decision, Chief Justice Robert N.C. Nix, Jr. authored the lead opinion, which was joined in full by Justices John P. Flaherty and Stephen A. Zappala, Sr. Justice Rolf Larsen concurred in the result only, and Justice Nicholas P. Papadakos, joined by Justice James T. McDermott, dissented.

unconstitutional"); (2) the trial court erred by denying the motion for *nolle prosequi* when the Commonwealth averred that it could not ethically proceed under Rule of Professional Conduct 3.8 due to a lack of sufficient evidence; and (3) the trial court's denial of the motion for *nolle prosequi* violated the doctrine of separation of powers. *Commonwealth v. Harrison*, 307 A.3d 71, 76 (Pa. Super. 2023).

The Superior Court[10] addressed these claims in a unified fashion, noting that "the second and third claims are variations of the first claim, which concerns the standard of review to be applied. [Thus,] resolution of the standard of review argument suffices to dispense with the second and third points of error." *Id.* at 78 n.4. Notably, the court confined its analysis to only the trial court's rationale for denying the Commonwealth's second petition for *nolle prosequi* and the reason the Commonwealth provided at that time to support the petition — its assertion that, because of the death of its witness Harrington, there was insufficient evidence to obtain a conviction of Officer Harrison. *Id.* at 82.

In addressing the Commonwealth's claim that the trial court applied an incorrect standard of review to the second *nolle prosequi* motion, the Superior Court discussed our Court's relatively recent decision in *In re Ajaj, supra,* which the Commonwealth contended established the standard of review the trial court should have employed. In that case, the mother of two minor children had taken them to Iraq and remained there to allegedly thwart their father's custodial rights. In an effort to facilitate the children's return, the father

---

[10] The majority opinion was authored by President Judge Emeritus John T. Bender and joined by President Judge Jack A. Panella and then Judge, now Justice, Daniel D. McCaffery. As discussed *infra,* Judge McCaffery also authored a concurring statement which Judge Panella also joined.

filed a private criminal complaint pursuant to Pa.R.Crim.P. 506[11] against mother for the criminal offenses of interference with the custody of minor children and concealment of the whereabouts of a minor child.[12] The district attorney disapproved the criminal complaint, citing both a legal justification — his asserted inability to obtain evidence sufficient to prove that mother committed these offenses, as well as his general policy against making conduct involving a custody dispute subject to criminal prosecution, and his general policy against permitting felony charges to be brought by a private party.

The disapproval decision was reviewed by a judge of the court of common pleas, who entered an order overturning the district attorney's decision and directing him to approve the complaint. In reaching this decision, the trial court evaluated the district attorney's assertions that he would be unable to establish a *prima facie* case using a *de novo* standard of review, whereas the trial court applied an abuse of discretion standard to reviewing the district attorney's proffered policy reasons for rejecting the complaint. The Superior Court approved of the use of this bifurcated standard of review; however, our Court reversed.

In our opinion, we reviewed our caselaw, including *Benz*, *supra*, and rejected the approach utilized therein which applied a different standard of judicial review depending

---

[11] This rule provides that, in cases where a private party, who is not a law enforcement officer, seeks to commence criminal proceedings by filing a criminal complaint against another private party:

> (A) . . . the complaint shall be submitted to an attorney for the Commonwealth, who shall approve or disapprove it without unreasonable delay.
> (B) If the attorney for the Commonwealth:
> (1) approves the complaint, the attorney shall indicate this decision on the complaint form and transmit it to the issuing authority;
> (2) disapproves the complaint, the attorney shall state the reasons on the complaint form and return it to the affiant. Thereafter, the affiant may petition the court of common pleas for review of the decision.

Pa.R.Crim.P. 506.

[12] 18 Pa.C.S. §§ 2904(a), 2909(a).

upon whether the prosecutor's disapproval was based on a legal reason or a policy one. Instead, we adopted a unitary, narrow standard of judicial review encompassing both types of proffered reasons, permitting a trial court to overturn a prosecutor's disapproval of a private criminal complaint only when "the disapproval decision amounted to bad faith, occurred due to fraud, or was unconstitutional." *In re Ajaj*, 288 A.3d at 109. We concluded that such a restrictive standard gives "proper deference to the discretionary decision of the prosecutor — a member of the executive branch of the Commonwealth's government." *Id.* at 109-10.

In the case at bar, the Superior Court rejected the Commonwealth's argument that *Ajaj* required a trial court to utilize this same standard in reviewing a Commonwealth motion to *nolle prosequi* a case. The court acknowledged that prosecutors have considerable discretion in choosing how to prosecute cases, but it emphasized that the scope of this discretion narrows as the case proceeds from the initial filing of criminal charges to ultimate disposition. The court reasoned that the "demanding standard" of *Ajaj* is warranted with respect to a prosecutor's initial decision on whether to bring charges because of the "serious risk that the judicial branch is encroaching on the executive branch's powers" whenever it forces a district attorney to commence a prosecution that would not have otherwise occurred. *Harrison*, 307 A.3d at 83. However, the court determined that, by contrast, requiring the continuation of a prosecution which a district attorney has already begun did not present that same risk, as, in the court's view, this situation constituted regulation by the judicial branch of discretionary authority which a prosecutor had already elected to utilize, and, by so doing, involved the judiciary.

Accordingly, the Superior Court found dispositive the fact that the Commonwealth chose to pursue charges against Harrison, which the court deemed indicative of the Commonwealth's conclusion that "the case warranted prosecution both as a matter of law

and policy," and the judiciary was, at that point, part of the case. *Id.* at 84. The Superior Court noted that this decision triggered Pa.R.Crim.P. 585's requirement that the trial court approve any decision by the Commonwealth to *nolle prosequi* the case, a requirement that, in its view, would be thwarted if the trial court's review was limited only to situations which amounted to bad faith, fraud, or unconstitutionality. Under that standard, the court observed that the Commonwealth could base a motion to *nolle prosequi* on any change in the factual circumstances which occurred after the filing of charges. The court opined that, by contrast, a *de novo* standard of review for pure questions of law such as the one presented by the Commonwealth's motion — *i.e.*, whether the available evidence was legally sufficient to obtain a conviction, the standard it used in *Stivala* — best ensured that the purpose of Rule 585 would be met.

The Superior Court also cited two decisions from our Court which it interpreted as supporting the use of a *de novo* standard of review: *Commonwealth v. Brown*, 196 A.3d 130 (Pa. 2018) (holding that Commonwealth's concession that trial counsel rendered ineffective assistance of counsel in sentencing phase of death penalty case did not obligate the post-conviction court to accept this conclusion and vacate his death sentence, as the issue of ineffectiveness was a legal question, subject to independent judicial review), and *Commonwealth v. Perrin*, 291 A.3d 337, 346 (Pa. 2023) (holding that trial court was not obligated to accept Commonwealth stipulation that a proposed witness's testimony in support of a motion for a new trial was credible, as such a determination "does not solely affect the parties and intrudes on the jurisdiction and prerogative of the court," given that the community has an interest in the verdict). The Superior Court viewed these cases as reinforcing the principle that a trial court is not required to accept the Commonwealth's concession of a legal point, but, instead, "is

permitted to evaluate the Commonwealth's legal conclusion for itself." *Harrison*, 307 A.3d at 85.

The Superior Court proceeded to assess whether the evidence was sufficient for the Commonwealth to obtain a conviction of Harrison:

> The crucial facts of this case are relatively simple, as the key is simply whether Harrison negligently grabbed and deployed his firearm. Thus, the question for the fact-finder is simply whether Harrison acted negligently under the circumstances. Notably, there is no suggestion that this case involved a justified shooting based on Smith's conduct. Thus, it is unclear why Harrington is so crucial given that everything from inside is captured on the cell phone video and other witnesses are available to testify as to the events outside.
>
> The Commonwealth does not elaborate on its claim that Harrington's testimony is critical, instead focusing on its preference to describe its assessment as involving a pure policy question. Indeed, the Commonwealth does not even claim that the evidence is needed to prove its case-in-chief. Instead, it claims that Harrington's testimony would be needed to combat an anticipated defense. Even extending the Commonwealth the benefit of the doubt that the Commonwealth is referring to cross-examination of the Commonwealth's witnesses, the Commonwealth does not explain what that defense would be.

*Id.* at 86 (footnotes omitted). The court concluded that the available evidence, if accepted by the factfinder, was legally sufficient to establish the crime of negligent simple assault, and, accordingly, it affirmed the trial court's decision.[13]

---

[13] Then-Judge McCaffery penned a concurring opinion, joined by President Judge Panella, in which he highlighted that the fundamental role of trial courts under our Rules of Criminal Procedure is to ensure that "justice is carried out." *Harrison*, 307 A.3d at 87 (McCaffery, J., concurring). To better achieve that objective, Judge McCaffery recommended that, whenever the Commonwealth files a motion for *nolle prosequi*, trial courts be required to conduct an on the record colloquy that "would require the prosecution to explain precisely what facts or circumstances changed leading up to its decision to seek a *nolle pros[se]* and why the decision is being made." *Id.*

The Commonwealth filed a petition for allowance of appeal from the Superior Court order, which we granted to consider whether the Superior Court erred in affirming the trial court's denial of its motion for *nolle prosequi* because the trial court allegedly failed to apply the *Reinhart* standard for determining whether a motion by the Commonwealth for the entry of a *nolle prosequi* for criminal charges it has brought should be granted.[14]

## II. Argument

The Commonwealth argues that prosecutors have a duty to ensure that guilt is established on sufficient evidence and, if they do not possess such evidence, they have the duty to withdraw or dismiss the charges where it is appropriate to do so. The Commonwealth avers that this duty is "codified" in 42 Pa.C.S. § 8932 and Pa.R.Crim.P. 585. Commonwealth Brief at 16. The Commonwealth acknowledges that its discretion to seek withdrawal of charges via a *nolle prosequi* is "not unfettered," and that it must seek approval from a court to effectuate it. *Id.* at 17. The Commonwealth also recognizes that a trial court, in deciding such a motion, will make its decision based on the test established by this Court in *Reinhart,* and that, in order to grant the motion, the court must be satisfied that the Commonwealth has met both prongs of this test, *i.e.*, "the reason given by the Commonwealth for requesting the *nolle prosequi* [is] valid and reasonable," and whether the defendant, at the time the *nolle prosequi* is requested, does not have a valid speedy trial claim.[15] *Id.* (quoting *Reinhart*, 353 A.2d at 853). The Commonwealth

---

[14] Harrison did not join this petition, nor file his own separate petition; however, he has filed a brief in this matter as "appellee" which adopts the arguments of the Commonwealth and stresses his agreement with the Commonwealth's assertion that *Reinhart* is the controlling precedent, as well as its assertion that the lower courts did not apply this standard in their decisions. Neither the victim, Ryan Smith, nor his mother are participating in this appeal.

[15] The second prong of the *Reinhart* test — whether Harrison had a valid speedy trial claim — is not implicated in this appeal, as Harrison did not raise such an issue before the trial court, and he does not presently assert any such claim.

maintains that this standard is not a *de novo* one, but it claims this is how the trial court erroneously viewed and applied it.

The Commonwealth criticizes the trial court for conducting its own assessment of the evidence in ruling on its motion, alleging that its assessment was incomplete because it did not take any of the steps a prosecutor is ethically obliged to do in preparing a case for trial, such as reading a police report, speaking with witnesses and the investigating troopers, being present for live witness testimony, reading defense reports, and examining the physical evidence. *Id.* at 26. The Commonwealth asserts that it took all of these steps, and, as a result, it was error for the trial court to substitute its "own limited review of the evidence" for the Commonwealth's more comprehensive one. *Id.*

The Commonwealth avers that the absence of Harrington at trial was a valid and reasonable basis for the *nolle prosequi* and that the trial court should have accepted it. Further, the Commonwealth propounds that the trial court compounded this error by referring, generally, to other categories of cases like rape and domestic violence in which the court perceived the Commonwealth as proceeding to trial with much less evidence and conflicting witness testimony. The Commonwealth maintains that, in so doing, the trial court improperly considered extraneous factors other than the reason proffered in support of its motion.

The Commonwealth criticizes the Superior Court for failing to cite *Reinhart* or apply that decision's valid and reasonable standard. The Commonwealth contends that the Superior Court's putative adoption of what it characterizes as a *de novo* standard of review, derived from its own holding in *Stivala*, contravenes the *Reinhart* standard. The Commonwealth posits that *Stivala* is factually distinguishable, because that case addressed whether the Commonwealth could establish a *prima facie* case, not whether the Commonwealth could meet its higher burden of establishing a defendant's guilt

beyond a reasonable doubt.  The Commonwealth further attacks the precedential value of *Stivala*, given that its reasoning relied on our Court's decision in *Benz*, which *Ajaj* overturned.

The Commonwealth argues that the Superior Court's decision "completely usurps the prosecutorial function without authority," effectively "conscripting the District Attorney's Office into service," no matter if a change in circumstances occurs during a case's progress through the criminal justice system.  *Id.* at 32.  The Commonwealth predicts that this decision will compel a prosecutor in a future case to proceed to trial against someone even if there is a material change in circumstances beyond its control.  *Id.* at 32-33.  The Commonwealth avers that such a standard disregards an assessment by a prosecutor that the changed circumstances may have resulted in his or her conclusion that a conviction beyond a reasonable doubt can no longer be obtained, but, yet, would force the prosecutor to take the case to trial anyway.  This, the Commonwealth professes, is in contravention of its duties set forth in Pa.R.P.C. 3.8,[16] and our Court's recognition that "[a]s an 'administrator of justice,' the prosecutor has the power to decide . . . to withdraw charges where appropriate, and, ultimately, to prosecute or dismiss charges at trial."  Commonwealth Brief at 34 (quoting *Commonwealth v. Clancy*, 192 A.3d 44, 53 (Pa. 2018)).

The Commonwealth contends that this context is distinguishable from asking a trial court to accept a proposed plea agreement.  The Commonwealth submits that a plea agreement is a contractual arrangement between a prosecutor and a defendant "meant to bind the court in its core functions of sentencing and [administering] justice," and, thus,

---

[16]  This rule provides in relevant part:
> The prosecutor in a criminal case shall:
> (a) refrain from prosecuting a charge that the prosecutor knows is not supported by probable cause[.]

Pa.R.P.C. 3.8.

to require a court to accept the agreement would inhibit the court from fulfilling those core functions. *Id.* By contrast, according to the Commonwealth, a prosecutor's decision to discontinue a prosecution does not bind a court in the same way, and goes "to the heart of the prosecutorial function," which is to withdraw, prosecute, or dismiss charges. *Id.* The Commonwealth also avers that the cases of *Brown* and *Perrin*, relied on by the Superior Court, have little precedential value, inasmuch as they involved prosecutorial decisions made in post-conviction proceedings, not discretionary decisions on whether to take a case to trial.

For all of these reasons, the Commonwealth asks us to repudiate what it considers to be the Superior Court's adoption of a *de novo* standard of review and reaffirm that the "valid and reasonable" standard in *Reinhart* governs. Consistent therewith, the Commonwealth asks us that we reverse the decision of the Superior Court and remand to the trial court for an entry of a judgment of *nolle prosequi* in this matter.

### III. Analysis

The role of courts with respect to the entry of a *nolle prosequi* has evolved along with the development of the Anglo-American justice system. Historically, under English common law, the power to voluntarily discontinue a prosecution rested exclusively with the Crown prosecutor — the Attorney General. *See generally "Power of court to enter nolle prosequi or dismiss prosecution,"* 69 A.L.R. 240 (1930-2025). This power was regarded as absolute and inviolable by the English courts, who were empowered to do no more than unquestioningly assent to a prosecutor's request to *nolle prosse* a criminal case, as it was deemed to be within the exclusive sphere of his official authority. *Prosecutor's Discretion*, 103 U. Pa. L. Rev. 1057, 1066-67 (1955). As our Superior Court has recounted, the role of the judiciary of that era was relegated to nothing but a mere

rubber stamp for such prosecutorial requests, a fact which was memorably illustrated by a leading historian of the British common law, Sir John Campbell:

> How firmly the rule vesting the exclusive power in the prosecuting officer to dismiss a case was established at common law is forcibly and effectively illustrated in a conversation relating to the commitment for seditious language of certain persons belonging to a sect called 'Prophets.' Lacy, one of the friends of the prisoners committed, assumed to intercede for them, and upon his conference with [Chief Justice] Holt the following colloquy is reported:
>
> Lacy: 'I come to you, a prophet from the Lord God, who has sent me to thee, and would have thee grant a *nolle prosequi* for Mr. Atkins, His servant, whom thou hast cast into prison.'
>
> Chief Justice Holt: 'Thou art a false prophet, and a lying knave. If the Lord God had sent thee, it would have been to the Attorney General, for He knows that it belongeth not to the Chief Justice to grant a *nolle prosequi*. [3, Campbell, Joseph Arnold, "*The Lives of the Chief Justices of England,*" 59 (1878)].

*Commonwealth v. Kindness*, 371 A.2d 1346, 1349 (Pa. Super. 1977) (*en banc*).

After winning our nation's independence from England, American courts initially followed the English common law rule of complete deference to the decision of state prosecutors to *nolle prosse* a case, given that such officials were vested with similar wide-ranging powers with respect to the conduct of criminal prosecutions. *Prosecutor's Discretion*, 103 U. Pa. L. Rev at 1067. This judicial deference was extended even after a formal criminal indictment or information was lodged against a defendant. LaFave, *et al.*, 4 *Criminal Procedure* § 13.3(c) (4th. ed. 2024) ("LaFave").

However, as Professor Wayne LaFave recounts,

> Concern over this unbridled discretion in the prosecutor resulted in legislation or rules of court in many jurisdictions intended to restrain the *[nolle prosse]* power of the prosecutor. These provisions, at a minimum, forced the prosecutor to explain his reasons for doing so in writing, thus assuring

greater visibility of the manner in which the prosecutor acted; at a maximum they required that he receive judicial approval to make his decision effective. Most jurisdictions have imposed such restraints only after formal accusation by indictment or information, but some others apply them to all cases which have passed the preliminary hearing stage.

*Id*. (quotation marks and footnotes omitted).

Pennsylvania has long required judicial approval of a prosecutor's decision to *nolle prosse* a case. Prior to 1850, the elective office of the district attorney did not exist, and to the extent the Commonwealth's Attorney General prosecuted criminal cases, our legislature forbade him to *nolle prosse* a case after a grand jury indictment, "except in the case of assault and battery, fornication and bastardy, on agreement between the parties, and in prosecutions for keeping tippling houses, with the consent of court." Act 29 of March 1819; John Purdon, Compiler; Frederick C. Brightly, Compiler, *Digest of the Laws of Pennsylvania, from the Year One Thousand Seven Hundred to the Sixth Day of June, One Thousand Eight Hundred and Eighty-Three* at 480 n.21 (11th ed. 1885) ("Purdon").

In 1850, Pennsylvania's General Assembly first created the elective office of district attorney, an office which was unknown at the common law, and enumerated the various duties of the officeholder, which included the authority to "conduct in court all criminal and other prosecutions in the name of the commonwealth." Act of May 3, 1850, P.L. 654, § 1; *see also Commonwealth ex rel. Minerd v. Margiotti*, 188 A. 524, 529 (Pa. 1936). However, in the same legislation that created the office of district attorney, the legislature also firmly established that the district attorney had no authority to enter a *nolle prosequi* in any criminal case without written approval of the court of common pleas. *See* Act of May 3, 1850, P.L. 654, § 1 ("Said district attorney shall in no case whatever have authority to enter *nolle prosequi* in any criminal case, either before or after bill found, or to discharge a prisoner from custody, without first having obtained the approbation of the Court, in writing[.]"); *see also Berks County v. Pile*, 18 Pa. 493, 495 (1852).

In 1860, as part of the adoption of a comprehensive statutory regime governing all criminal proceedings in the Commonwealth, the General Assembly once more reiterated its affirmative mandate that a district attorney must seek consent from a court before terminating a criminal proceeding which he or she had formally commenced. *See* Act of March 31, 1860, P.L. 427, § 29, 19 P.S. § 492 (repealed); Purdon at 480, § 30 ("No district-attorney shall, in any criminal case whatsoever, enter a *nolle prosequi*, either before or after bill found, without the assent of the proper court in writing first had and obtained.").

This legislative mandate has remained virtually unchanged since that time, reposing presently in Section 8932 of the Judicial Code which, as related previously, states:

> After the commencement of a criminal matter by the filing of an information or otherwise, the district attorney shall not enter a *nolle prosequi* or dispose of the matter or discharge a prisoner from custody by means of a proceeding in lieu of a plea or trial without having obtained the approval of the court.

42 Pa.C.S. § 8932.

Additionally, since 1964, our Rules of Criminal Procedure have also included the requirement that the Commonwealth seek judicial approval of a request to *nolle prosequi* a pending criminal proceeding. As noted above, these rules currently specify:

> Upon motion of the attorney for the Commonwealth, the court may, in open court, order a *nolle prosequi* of one or more charges notwithstanding the objection of any person.

Pa.R.Crim.P. 585(A).

Subsequent to the promulgation of these measures, our Court has elucidated and delineated the specific powers and duties a district attorney and the courts of this Commonwealth each possess with respect to the adjudication of a district attorney's motion to *nolle prosequi* a criminal case:

> A District Attorney has a General and widely recognized power to conduct criminal litigation and prosecutions on behalf of the Commonwealth, and to decide whether and when to prosecute, and whether and when to continue or discontinue a case. . . . But this broad general power of a District Attorney is subject to the right [and] the power of a Court (a) to provide generally for the orderly administration of criminal Justice, including the right and power to supervise all trials and all Court proceedings, and (b) to protect all of a defendant's rights to a fair trial and due process under the Constitution of the United States and the Constitution of Pennsylvania. More particularly, these powers of a Court include supervision of the trial lists, *the grant or refusal of a continuance and of a nolle pros[se]-all of which are, at a proper time, subject to appellate review.*

*Commonwealth v. DiPasquale*, 246 A.2d 430, 432 (Pa. 1968) (emphasis added and citations omitted). This principle, which recognizes that the trial courts of this Commonwealth have both the authority, and indeed the duty, to evaluate the Commonwealth's request to *nolle prosequi* a criminal case, and that our appellate courts likewise have the authority and duty to review their ultimate decision, has remained an integral tenet of our Commonwealth's jurisprudence throughout the intervening years. *See, e.g., Reinhart,* 353 A.2d at 853; *Commonwealth v. Rega*, 856 A.2d 1242, 1245 (Pa. Super. 2004).

*In DiPasquale*, we established the standard of appellate review of a trial court's denial of Commonwealth motion to *nolle prosequi:* whether the trial court abused its discretion. 246 A.2d at 432. This continues to be the standard by which appellate courts review trial court decisions on such motions. *Reinhart*, 353 A.2d at 853.

As our Court has oft stated, "[a]n abuse of discretion exists when the trial court has rendered a judgment that is manifestly unreasonable, arbitrary, or capricious, has failed to apply the law, or was motivated by partiality, prejudice, bias, or ill will." *Mader v. Duquesne Light* Company, 241 A.3d 600, 607 (Pa. 2020). The question of whether a trial court abused its discretion in refusing the Commonwealth's request for the

entry of a *nolle prosse*, is a mixed question of law and fact. Consequently, as with our review of all such mixed questions,

> to the extent that factual findings and credibility determinations are at issue, we will accept the trial court's conclusions insofar as they are supported by the record. *To the extent that a legal question is at issue, a determination by the trial court will be given no deference and will instead be reviewed de novo.*

*Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 13 (Pa. 2014) (emphasis added); *accord Commonwealth v. Knox*, 190 A.3d 1146, 1152 (Pa. 2018).

Although Section 8932 and Pa.R.Crim.P. 585 confer on the trial court the exclusive authority to approve or disapprove a Commonwealth request to *nolle prosequi* criminal charges, neither provision specifies the principles that guide its decision. However, in *Reinhart*, we instructed trial courts to examine the reason "given by the Commonwealth" in support of the motion, and then determine if that reason is both "valid and reasonable." *Reinhart,* 353 A.2d at 853. Thus, *Reinhart* requires the Commonwealth to furnish to the trial court the particular reasons for seeking the *nolle prosse,* and do so with sufficient specificity so that the trial court may properly evaluate its request. *Id.*; *accord Rega*, 856 A.2d at 1245.

As we further explained in *Reinhart*, "a motion for a *nolle prosequi* is treated like any other motion: one side presents the motion to the court; both sides argue the merits of the requested motion; the court considers the merits of their arguments; and the trial court issues a ruling." *Reinhart*, 353 A.2d at 851-52. Thus, after the Commonwealth presents its reasons to the trial court for granting the motion, and, under Rule 585, the court hears from any person opposing the motion, the trial court must assess the "validity and reasonableness" of the Commonwealth's stated reasons for requesting the *nolle prosequi*, both in its motion and as further developed at the hearing on the motion. This

is a straightforward standard which requires trial judges to evaluate the legal merits of the Commonwealth's assertions and resolve any disputed material factual matters.

The trial court's evaluation of the legal claims which the Commonwealth is making, and any legal arguments offered in opposition, will, of course, depend on the particular nature of such claims. *See, e.g., Reinhart* (ruling that entry of *nolle prosequi* did not deny appellant's due process right to a speedy trial based on conclusion that 93-day delay was not presumptively prejudicial as a matter of law); *Commonwealth v. Leaming*, 275 A.2d 43 (Pa. 1971) (rejecting Commonwealth's claim that *nolle prosequi* was legally justified by its bare assertion of unfounded hope that this court would change our caselaw and reverse its earlier ruling legally barring the use of an unconstitutionally coerced confession).

In making its ultimate ruling on the validity and reasonableness of the legal basis offered for the *nolle prosse* request, the trial court is considering the matter in the first instance and is therefore not bound to accept the legal rationale offered by the Commonwealth and any opposing party. *See*, *e.g.*, *Thierfelder v. Wolfert*, 52 A.3d 1251, 1264 (Pa. 2012) ("The question of duty in tort is a legal determination, assigned in the first instance to the trial court.") (internal quotation omitted); *Graham v. Today's Spirit,* 468 A.2d 454 (Pa. 1983) (questions of law presented to the trial court are for it to resolve in the first instance); *Commonwealth v. Fulton,* 876 A.3d 342 (Pa. 2002) (disapproving of a trial court's wholesale adoption of Commonwealth brief as its opinion disposing of contested issue, inasmuch as such an action suggests trial court did not fulfill its duty to independently review and analyze disputed claims); *Brown*, 196 A.3d at 146 (even where prosecuting attorney and defendant stipulated legal error was committed, the trial court is not bound by such stipulation and must perform independent judicial review).

Regarding disputed matters of material fact related to the motion, the trial court will, in accordance with its traditional role, make factual findings. *See, e.g.*, *Commonwealth v. Melton*, 168 A.2d 328, 329 (Pa. 1961) (resolution of factual questions lie "peculiarly within the province of the trial court to resolve"); *see also Reinhart* (holding that trial court's acceptance of Commonwealth's factual averment that its key witness was suddenly and unexpectedly unavailable for trial justifying its request for a *nolle prosse* was supported by the record).

We acknowledge the Commonwealth's argument that prosecutors are responsible for overseeing the conduct of criminal prosecutions, and that they are therefore keenly aware of the factual strengths and weaknesses of all aspects of the case which they are prosecuting. Accordingly, in deference to those prosecutorial responsibilities, in evaluating factual assertions undergirding a request for a *nolle prosse*, the trial court should apply a preponderance of the evidence standard in making its determination as to whether the stated factual reasons are valid and reasonable. *See In re Fortieth Statewide Investigating Grand Jury*, 190 A.3d 560, 574 (Pa. 2018) ("'Preponderance' means the greater weight of the evidence, or evidence that 'tips the scales' toward belief. . . . The application of this standard is best suited to adversarial proceedings where competing litigants present evidence to be weighed by a factfinder.") (citations omitted).

In this regard, the highly deferential standard of review of a prosecutor's initial decision not to bring criminal charges which we articulated in *Ajaj* does not govern this situation, where the Commonwealth has *already* independently exercised its discretion to file criminal charges, and successfully argued to a neutral magistrate that sufficient probable cause exists to have those charges adjudicated in a criminal trial. As we recognized in *DiPasquale*, the Commonwealth's act of bringing criminal charges and then obtaining judicial approval to pursue them directly implicates the duty of judges to secure

the orderly administration of justice by supervising the resulting proceedings, and to protect the accused's rights to a fair trial and due process.[17]

Moreover, and importantly, once criminal charges have been filed by law enforcement and a district attorney on behalf of the Commonwealth presents evidence at a hearing before a magistrate judge which results in those charges being held by that magistrate judge for trial, the public has a compelling interest in being assured that the ultimate disposition of those charges will be through a trial which justly and fairly determines the question of the accused's innocence or guilt, as well as an equally strong interest in being assured that any dismissal of those charges without trial will serve the same interests of justice for the benefit of society and the victims of the crimes which have been charged.

It is for these reasons that, as discussed above, our legislature expressly granted the judiciary the full power to review the dismissal of criminal charges via a motion for *nolle prosequi* and to commit the final decision, subject to appellate review, on such a request exclusively to the discretion of our Commonwealth's trial judges. Consequently, the far more deferential standard of review *Ajaj* provided for evaluating a prosecutor's

---

[17] We respectfully disagree with the assertion in the concurring and dissenting opinion that we are addressing an issue not raised by the Commonwealth. *See* Concurring and Dissenting Opinion (Dougherty, J.) at 4. In its brief to this Court, the Commonwealth assails the Superior Court for not applying the deferential standard of review utilized by our Court in *In re Ajaj*. *See* Commonwealth Brief at 31-32 ("Despite a lengthy discussion of *In re Ajaj* and the acknowledgment that it abrogated *Benz*, Superior Court dismissed it being applicable here because that prosecutorial discretion only involved whether to charge at all. . . . Completing its pretzel logic, Superior Court then held, after finding *In re Ajaj* was inapplicable, that the *Stivala de novo* standard of review applied, despite the fact it was based on *Benz*, which was abrogated by *In re Ajaj*."). In our view, these assertions can be fairly read as expressing the Commonwealth's disagreement that the *Reinhart* standard should apply at all to review of trial court decisions of this nature in the aftermath of *In re Ajaj*, and our discussion is intended to make clear that, at present, *Reinhart* remains the controlling authority governing the trial court's denial of a Commonwealth *nolle prosequi* motion. We express no opinion on whether this standard should be reconsidered, as that issue is not before us.

decision in the first instance not to bring criminal charges is not applicable in this situation, as in making such a decision, by contrast to the decision to *nolle prosequi*, the prosecutor bears the bulk of the ultimate discretionary responsibility.

In sum then, we reaffirm that the *Reinhart* standard applies to a trial court's review of a Commonwealth motion for a *nolle prosse*. This standard requires the trial court to examine the specific legal and factual reasons that the Commonwealth has presented to it to justify the entry of the *nolle prosse*, and then to assess whether those reasons establish a valid and reasonable basis to grant the request.

Although the Superior Court panel regrettably did not discuss *Reinhart* in its review of the trial court's decision, it is well-established that an appellate court may uphold an order of a lower court for any valid reason appearing from the record. *Ario v. Ingram Micro, Inc.*, 965 A.2d 1194, 1200 (Pa. 2009). This jurisprudential doctrine stems from our focus "on the judgment or order before the appellate court, rather than any particular reasoning or rationale employed by the lower tribunal." *Id.* Our independent examination of the record supports the conclusion that the trial court properly employed the *Reinhart* standard in ruling on the Commonwealth's second motion for *nolle prosequi*. In that motion, the Commonwealth provided these specific reasons in support of its request:

> The factual complexity of this case and nuanced applicable law, in combination with the requisite burden of proof, rendered Mr. Harrington's testimony critical to any successful prosecution. Without Mr. Harrington's testimony, the Commonwealth cannot meet its evidentiary burden in establishing that the Defendant acted with criminal negligence.

Commonwealth Second Motion for *Nolle Prosequi*, 9/14/21.[18]   At the hearing on the Commonwealth's motion, the prosecutor additionally claimed that Harrington's testimony was relevant to "an anticipated defense," but, critically, never explained to the trial court what that defense was, or how Harrington was relevant to establishing it.  N.T. Hearing, 11/1/21, at 4.

Distilled to its essence, then, the Commonwealth's sole basis supporting its request for *nolle prosse* in this case was its assertion that the totality of the evidence which it could factually, legally, and ethically present at trial — which excluded Harrington's prior eyewitness account relayed to the investigating troopers given his subsequent death — was insufficient as a matter of law to carry its burden of proof beyond a reasonable doubt that Harrison committed criminal negligence when he shot the victim.  Stated another way, the Commonwealth was claiming that, even if it presented all the available evidence at its disposal at trial, no rational trier of fact could find that the elements of the crime of negligent simple assault had been established beyond a reasonable doubt.  *See Commonwealth v. Brown*, 52 A.3d 1139, 1164 (Pa. 2012) ("[O]ur Court's determination of the ultimate question of evidentiary sufficiency parallels the central inquiry under the *Jackson [v. Virginia,* 443 U.S. 307 (1979)] standard, namely, whether any 'rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'").[19]

---

[18]  The Commonwealth does not presently contend that it was seeking dismissal of the prosecution for any policy-based reasons, and it disclaims any reliance on the "rehabilitation-related basis" that it proffered in support of the first *nolle prosequi* motion. The Commonwealth avers that consideration of the validity and reasonableness of the reason it provided in the second motion "is and must be completely independent from any initial *nolle prosequi* request."  Commonwealth Brief at 25 n.8.

[19]  Although the concurring and dissenting opinion suggests we should remand this case to the Superior Court so that it may conduct this review in the first instance, we decline to do so in the interests of judicial economy, given that the evidentiary record developed in the trial court is not in dispute and the question of whether the evidence was sufficient for the Commonwealth to carry its evidentiary burden at trial is a purely legal one.

Our examination of the record in this case supports the conclusion that the trial court's rejection of this claim is supported by the record extant at the time of the motion. The trial court reviewed this record and found that there were other witnesses available to testify who could factually establish the circumstances which occurred in the bank prior to the shooting, and address how the act of the shooting itself transpired. These included the victim, his mother, and other bank personnel. Thus, the trial court deemed the testimony of these available witnesses, in and of itself, legally sufficient for the Commonwealth to carry its burden of proof to a factfinder at trial that Harrison was guilty of the offense of negligent simple assault for shooting the victim in the manner in which he did. Its conclusion is amply supported.

The trial court also assessed the reasonableness of the Commonwealth's contention that Harrington was the sole independent witness whose interests did not align with either the victim or with the police. The court flatly rejected that assertion as "based upon inaccurate facts." Trial Court Opinion, 6/10/22, at 8. The trial court reminded that Hendrickson-Cozio, who was an employee of the bank with no personal connection to either the police officers or the victim, testified at the preliminary hearing that she "saw Smith being led to the patrol car by the officers, saw Smith seated in the police vehicle and saw Defendant shoot Smith." *Id.* The record supports this conclusion as well.

As a result, we find the record supports the trial court's conclusion that the Commonwealth's reasons for seeking *nolle prosequi* were neither valid nor reasonable. For all of these reasons, then, we affirm the Superior Court's order upholding the trial court's denial of the Commonwealth's motion for *nolle prosequi*.

Order affirmed.

Justices Donohue, Wecht and Brobson join the opinion.

Justice Dougherty files a concurring and dissenting opinion in which Justice Mundy joins.

Justice McCaffery did not participate in the consideration or decision of this matter.